## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>ANTHONY CAINE, ANISH PARVATANENI, LJM FUNDS MANAGEMENT, LTD., and LJM PARTNERS, LTD.,<br><br>Defendants. | Case No. 21-cv-2859<br><br>Hon. Mary M. Rowland<br><br><br><br>JURY TRIAL DEMANDED |

## DEFENDANTS' ANSWER TO COMPLAINT

Defendants LJM Funds Management, Ltd. ("LJMFM") and LJM Partners, Ltd. ("LJM Partners"), (collectively, "LJM"), Anthony Caine ("Caine") and Anish Parvataneni ("Parvataneni"), (collectively, "Defendants"), by and through their attorneys, submit the following Answer to Plaintiff Securities and Exchange Commission's Complaint, as follows:

### Nature of the Case

1.      This enforcement action addresses Defendants' material misrepresentations and breaches of fiduciary duty relating to the risks of an options trading strategy they employed as investment advisers to a mutual fund, the LJM Preservation & Growth Fund (the "P&G Fund"), and/or several private investment funds (the "Private Funds"), which collectively suffered over a billion dollars of losses in February 2018. During the prior two years, the Defendants had, among other things, lied to investors about the "worst case" daily losses to expect from this strategy—both the method by which Defendants calculated such estimates and the amount of potential losses this methodology revealed — as well as falsely promised to maintain "a consistent risk profile." As a result, Defendants were able to grow their assets under management, which resulted in them receiving millions of dollars of compensation.

**ANSWER:**      Defendants deny the allegations of paragraph 1.

2.      Caine owned and controlled the subject investment advisory firms, LJM Management and LJM Partners (together, "LJM"), and both he and Parvataneni were portfolio managers for the P&G Fund and the Private Funds.

**ANSWER:** Defendants admit the allegations of paragraph 2.

3. Defendants' investment strategy, commonly known as a "short volatility strategy," generated income by using margin to sell out-of-the-money options on S&P 500 futures contracts. The strategy carried risks that were remote but extreme.

**ANSWER:** Defendants deny the allegations of paragraph 3.

4. Thus, investors in the funds managed by LJM were concerned about how Defendants managed risk and wanted to know how much of their investment they might lose during an extreme market event. These concerns were regularly relayed to Defendants, and discussed internally at LJM.

**ANSWER:** Defendants have insufficient knowledge and information to form a basis as

to the truth of the allegation in sentence 1 and deny the allegations in sentence 2 of paragraph 4.

5. In response to these investor concerns, Defendants crafted an effective, yet false, marketing narrative which touted their purported "risk centric" approach to investing and avowed their "managing principle" was to maintain a consistent risk profile and consistent risk levels, even if it meant lower returns.

**ANSWER:** Defendants deny the allegations of paragraph 5.

6. More specifically, Defendants claimed that: (a) they stress tested the portfolios against specific historical scenarios to estimate worst-case daily losses; (b) based on those stress tests, the estimated worst-case daily loss was 20% for the P&G Fund and 30 to 35% for the Private Funds; and (c) they managed these funds to maintain consistent risk levels.

**ANSWER:** Defendants deny the allegations of paragraph 6.

7. All of these statements were false. Although LJM automatically generated historical scenario stress tests on every trading day, Defendants did not use those stress tests to estimate worst-case losses to the portfolios during extreme market events. To arrive at the 20% estimated worst-case daily loss for the P&G Fund, for example, Defendants simply took the fund's worst performance on a single day (approximately 9%), doubled it, and then rounded up.

**ANSWER:** Defendants deny the allegations of paragraph 7.

8. Moreover, on nearly every trading day from late 2016 through early 2018, the historical scenarios stress test LJM purportedly used to estimate "worst-case" losses showed potential losses greater than the worst-case daily loss estimates disclosed to investors. In fact, on many occasions, Defendants' stress testing estimated potential loss exposure approaching or exceeding 100% of the funds' value.

**ANSWER:** Defendants deny the allegations of paragraph 8.

2

9.      In addition, during late 2017 and early 2018, Defendants deliberately pursued riskier investments to achieve their targeted returns. At the same time, Defendants falsely assured investors that they were maintaining the consistent risk profiles that they knew investors expected.

**ANSWER:**    Defendants deny the allegations of paragraph 9.

10.     In mid-January 2018, Caine, Parvataneni and others at LJM discussed the increased levels of risk in the portfolios and whether they should take action to reduce risk. Contrary to the representations made to investors, Caine decided to carry the increased risk in order to chase returns.

**ANSWER:**    Defendants admit the allegations in sentence 1 and deny the allegations in sentence 2 of paragraph 10.

11.     Not long after, in February 2018, the financial markets suffered a large spike in volatility over two consecutive trading days. The investment funds managed by LJM Management and LJM Partners suffered trading losses of more than $1 billion or approximately 80% of their value.

**ANSWER:**    Defendants admit the allegation in sentence 1 and deny the allegations in sentence 2 of paragraph 11.

12.     As described more fully below, Defendants knowingly or recklessly made, or substantially participated in making, misrepresentations and omissions of material fact, breached their fiduciary duties, and knowingly or recklessly failed to manage the investment funds in the manner disclosed to fund investors and board members. Defendants' conduct involved fraud, deceit, and/or the deliberate or reckless disregard of regulatory requirements, and resulted in substantial investor losses.

**ANSWER:**    Defendants deny the allegations of paragraph 12.

13.     Accordingly, Defendants violated the federal securities laws, including Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, Section 17(a) of the Securities Act of 1933 ("Securities Act"), Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") and Rules 206(4)-7 and 206(4)- 8 thereunder, and Sections 15(c) and 34(b) of the Investment Company Act of 1940 ("Investment Company Act").

**ANSWER:**    Defendants deny the allegations of paragraph 13.

14.     Each of the Defendants should be permanently enjoined from future violations of the federal securities laws, and should disgorge their ill-gotten gains, along with prejudgment interest. The Court also should require the Defendants to pay significant civil penalties.

**ANSWER:** Defendants deny the allegations of paragraph 14.

## Jurisdiction and Venue

15.     The Court has jurisdiction over this civil enforcement action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, Sections 21(a), 21A and 27(a) of the Exchange Act, Sections 209(d), 209(e) and 214(a) of the Advisers Act and Sections 42(d), 42(e) and 44 of the Investment Company Act.

**ANSWER:** Defendants admit the allegations of paragraph 15.

16.     Venue is proper in this District, pursuant to Section 22(a) of the Securities Act Section 27(a) of the Exchange Act, Section 214(a) of the Advisers Act and Section 42(d) of the Investment Company Act, because most of the Defendants currently reside or transact business in this District, and many of the acts and transactions constituting the securities law violations alleged herein occurred within this District.  In connection with the conduct alleged in this Complaint, Defendants have directly and indirectly made use of the mails and/or means or instrumentalities of transportation or communication in interstate commerce.

**ANSWER:** Defendants deny the allegation that any of their acts or transactions violated

the securities laws and admit the remaining allegations of paragraph 16.

17.     In connection with the conduct alleged in this Complaint, Defendants have directly and indirectly made use of the mails and/or means or instrumentalities of transportation or communication in interstate commerce.

**ANSWER:** Defendants deny the wrongful conduct alleged in this Complaint and

therefore deny the allegations in paragraph 17.

## The Defendants

18.     LJM Funds Management, Ltd. ("LJM Management") is an Illinois corporation based in Chicago, Illinois. LJM Management was registered with the SEC as an investment adviser until March 2018, when its registration was terminated. LJM Management served as the investment adviser to the LJM Preservation & Growth Fund (the "P&G Fund").

**ANSWER:** Defendants admit the allegations of paragraph 18.

19.     LJM Partners, Ltd. ("LJM Partners") is an Illinois corporation based in Chicago, Illinois. LJM Partners was the investment adviser to several related private investment funds (the "Private Funds") and separately managed accounts ("SMAs"). LJM Partners shared office space, officers, portfolio managers and employees with LJM Management. The two firms effectively operated as one entity, and referred to themselves as "LJM."

**ANSWER:** Defendants admit the allegations in sentences 1 and 3 and deny the allegations in sentences 2 and 4 of paragraph 19.

20. Defendant Anthony Caine, age 63, is a resident of Aspen, Colorado. Caine is the owner, founder and Chairman of both LJM Management and LJM Partners. Caine also was the co-portfolio manager of the P&G Fund and the Private Funds, and worked with Parvataneni to direct their investments and trading. Caine also oversaw, and was actively involved in, the day-to-day operations of the P&G Fund and the Private Funds, including the marketing, offer, and sale of fund shares.

**ANSWER:** Defendants deny the allegations in sentence 1, admit the allegations in sentences 2 and 3 and deny the allegations in sentence 4 of paragraph 20.

21. Defendant Anish Parvataneni, age 48, is a resident of Hinsdale, Illinois. From 2010 through March 2018, Parvataneni served as the co-portfolio manager of both the P&G Fund and the Private Funds, and worked with Caine to direct their investment and trading. Parvataneni also oversaw, and was actively involved in, the day-to-day operations of the P&G Fund and the Private Funds, including the marketing, offer, and sale of fund shares.

**ANSWER:** Defendants deny the allegations of paragraph 21.

## Related Entities

22. The LJM Preservation and Growth Fund was an open-end mutual fund managed by LJM Management and available to retail investors. The P&G Fund, which also met the definition of an investment company, was registered with the SEC pursuant to the Investment Company Act of 1940. The P&G Fund began operations in January 2013, but closed to new investments on February 7, 2018, and was liquidated in March 2018. Prior to February 2018, the P&G Fund held approximately $800 million in assets.

**ANSWER:** Defendants admit the allegations of paragraph 22.

23. The Two Roads Shared Trust ("Two Roads") is an open-end management investment company that consisted of multiple mutual funds. The P&G Fund was one of these funds.

**ANSWER:** Defendants admit the allegations of paragraph 23.

24. The Private Funds included the LJM Investment Fund LP, the LJM Preservation & Growth Fund, LP, the LJM Aggressive Fund LP, the LJM Fund, LP, the LJM Master Trading Fund, LP, the LJM Partners Insurance Fund, the PFC-LJM Fund LP, and the PFC-LJM Preservation & Growth Fund, LP. The Private Funds primarily invested in options on futures but maintained large cash balances as collateral for their options positions; this cash frequently was invested in money market funds.

**ANSWER:** Defendants admit the allegations in sentence 1 and deny the allegations in sentence 2 of paragraph 24.

## Facts

### A. Caine's Short-Volatility Investment Strategy.

25. Caine created the investment strategy employed by LJM Management and LJM Partners, which involved writing (*i.e.* selling) short-dated, out-of-the money options on S&P 500 futures contracts. The options sold were mostly put options, but also included some call options. Caine first offered this alternative investment strategy to high net-worth individuals, trusts, and institutional investors through the Private Funds and SMAs managed by LJM Partners. Beginning in 2013, Caine also made the strategy available to retail investors by creating a mutual fund, managed by LJM Management.

**ANSWER:** Defendants admit the allegations in sentence 1 and deny the remaining allegations of paragraph 25.

26. Caine first offered this alternative investment strategy to high net-worth individuals, trusts, and institutional investors through the Private Funds and SMAs managed by LJM Partners. Beginning in 2013, Caine also made the strategy available to retail investors by creating a mutual fund, managed by LJM Management.

**ANSWER:** Defendants deny the allegations of paragraph 26.

27. Like an insurance company, LJM Management and LJM Partners made money by collecting premiums (i.e., the market prices of the options) in exchange for assuming a risk – in this case, the obligation to purchase or sell futures contracts at a given strike price if the option holder exercised the option on or before the expiration date.

**ANSWER:** Defendants admit the allegation in sentence 1 of paragraph 27 that LJM "made money by collecting premiums… in exchange for assuming a risk – in this case, the obligation to purchase or sell futures contracts at a given strike price if the option holder exercised the option on or before the expiration date". Defendants deny the remaining allegations of paragraph 27.

28. This investment strategy is known as "short options" or "short volatility" trading, and offers the possibility of relatively stable profits from premium income, but carries the risk of significant losses during large market swings. This strategy was the equivalent of selling insurance

6

to other investors primarily against declines in the S&P 500 futures market.

**ANSWER:** Defendants admit the allegation in sentence 1 that the strategy is known as a "short options" or a "short volatility" strategy. Defendants note that the statement that "[the strategy] carries risk of significant losses during large market swings" is vague and ambiguous and on that basis the remainder of sentence 1 is denied. Defendants deny the allegations in sentence 2 of paragraph 28.

29. While LJM Management's and LJM Partners' investment strategy also included partially hedging their written option positions by purchasing long, close-to-the money put or call contracts, by design, their strategy was net "short," meaning they sold more option contracts than they purchased.

**ANSWER:** Defendants admit the allegations of paragraph 29.

30. LJM Management and LJM Partners offered three versions of this strategy, in different investment options, each of which differed in the targeted return and the amount of hedging employed. Investors could participate in the strategy through: (1) the P&G Fund; (2) the Private Funds; and/or (3) SMAs.

**ANSWER:** Defendants admit the allegations of paragraph 30.

31. The various investment options included:

| Strategy | Offered Through | Amount of Hedging | Targeted Return |
|---|---|---|---|
| Preservation and Growth | P&G Fund Private Funds SMAs | Most | 8-12% |
| Moderately Aggressive | Private Funds SMAs | Some | 18-24% |
| Aggressive | SMAs | Almost none | > 24% |

**ANSWER:** Defendants admit the allegations of paragraph 31.

32. The annual return targets of each version of the strategy were widely distributed to prospective investors and other investment advisers.

**ANSWER:** Defendants admit the allegations of paragraph 32.

7

**B.**    **Defendants' Approach to Risk Management.**

33.    LJM had a written "risk policy" with the stated goal of creating "a risk practice that [would] identify, define and mitigate risk related to corporate operations with special emphasis on trading operations."

**ANSWER:**    Defendants note that the allegations of paragraph 33 refer to a written risk policy.  Defendants refer to the written risk policy for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 33 are not consistent with the written risk policy, Defendants deny the allegations.

34.    To this end, according to the policy, "clear definition of roles and responsibilities [was] required," in order to "define who [was] authorized and accountable as well the source of authority" for risk management.

**ANSWER:**    Defendants note that the allegations of paragraph 34 refer to a written risk policy.  Defendants refer to the written risk policy for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 34 are not consistent with the written risk policy, Defendants deny the allegations.

35.    Per LJM's written risk policy, "risk philosophy and requirements" were to be defined "at the ownership/stakeholder level," portfolio managers were to be held "accountable to manage against risk," and a risk manager was to have "appropriate responsibility to maintain a viable risk practice."

**ANSWER:**    Defendants note that the allegations of paragraph 35 refer to a written risk policy.  Defendants refer to the written risk policy for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 35 are not consistent with the written risk policy, Defendants deny the allegations.

36.    LJM Management and LJM Partners shared a chief risk officer ("CRO") who was responsible for, among other things, assessing risk, creating and monitoring risk reports, and ensuring that portfolio managers followed controls and incorporated risk management into their trading.

**ANSWER:**    Defendants admit the allegations of paragraph 36.

*ACTIVE 58826746v13*

37.    As early as March 24, 2015, the CRO notified LJM Management's and LJM Partners' chief compliance officer that: "We really don't have an integrated risk control framework. So our risk function is throwing off lots of quality information, but . . . [we] have not yet integrated risk control into our trading practice."

**ANSWER:**    Defendants note that the allegations of paragraph 37 refer to a written email dated March 24, 2015.  Defendants refer to the email dated March 24, 2015 for a more complete and accurate statement of its contents, and to the extent that the allegations of paragraph 37 are not consistent with the email, Defendants deny the allegations.

38.    In fact, Caine and Parvataneni often ignored the CRO's risk reports (described below) when managing the funds' portfolios.

**ANSWER:**    Defendants deny the allegations of paragraph 38.

39.    At LJM, as its risk policy made clear, "ownership ha[d] the final say on risk." In other words, Caine had the final say on risk.

**ANSWER:**    Defendants note that the allegations in sentence 1 of paragraph 39 refer to a written risk policy.  Defendants refer to the written risk policy for a more complete and accurate statement of its contents, and to the extent the allegations in sentence 1 of paragraph 39 are not consistent with the written risk policy, Defendants deny the allegations.  Defendants admit the allegation in sentence 2 of paragraph 39.

**C.    Defendants' Marketing Narrative.**

40.    Defendants had years of experience in marketing the P&G Fund and the Private Funds to investors. Accordingly, Defendants learned that the funds' investors and their financial advisors were primarily concerned about the risk of loss – including estimated worst-case loss scenarios – and how the risk of investment loss was managed.

**ANSWER:**    Defendants deny the allegations of paragraph 40.

41.    In order to respond to these investor concerns, Defendants developed a marketing narrative, including talking points and other written materials, which focused on risk management. Defendants told fund investors, financial advisers, and Two Roads' board members and/or chief compliance officer, that LJM Management and LJM Partners employed sophisticated risk management procedures in order to manage their investment portfolios and control risk.

*ACTIVE 58826746v13*

**ANSWER:** Defendants deny the allegations in sentence 1 of paragraph 41 that Defendants developed a marketing narrative to "respond to these investor concerns". Defendants note that the remaining allegations in sentence 1 refer to talking points and other written materials. Defendants refer to the talking points and other written materials for more complete and accurate statements of their contents, and to the extent the remaining allegations in sentence 1 of paragraph 41 are not consistent with the talking points and other written materials, Defendants deny the allegations. Defendants admit the allegations in sentence 2 of paragraph 41.

42. More specifically, Defendants told investors and Two Roads that LJM Management's and LJM Partners' risk management efforts included stress testing the funds' portfolios against well-known historic market events – such as the failure of Lehman Brothers in 2008, the Flash Crash of 2010 and the S&P downgrade of U.S. debt in 2011. Defendants also told investors that LJM Management and LJM Partners were "risk centric," rather than "return centric," and explained both that they maintained a consistent level of portfolio risk regardless of market conditions and that they never increased portfolio risk levels to chase investment returns.

**ANSWER:** Defendants deny the allegations of paragraph 42.

43. Defendants' marketing efforts touted their risk management practices by pointing to the strong performances of the strategy during the 2008 market crash. As a result of Defendants' successful marketing narrative, the funds' assets under management increased from around $450 million in February 2016 to approximately $1.3 billion in February 2018 – including more than $800 million in the P&G Fund.

**ANSWER:** Defendants state that the use of the word "touted" is vague and ambiguous and on that basis, Defendants deny the allegations in sentence 1 of paragraph 43. Defendants deny the allegations in sentence 2 of paragraph 43.

**D. Defendants Provided False Worst-Case Loss Estimates to Investors.**

44. Initially, LJM Management and LJM Partners provided investors in the P&G Fund and the Private Funds with boilerplate disclosures that it was possible to lose their entire investment. But the funds' investors, and the investors' financial advisers, frequently asked Defendants for their worst-case loss scenarios and estimates of maximum investment losses during extreme market events in order to better understand the scope of risk in Defendants' investment strategy.

**ANSWER:** Defendants admit the allegation in sentence 1 that investors were provided

with disclosures stating that it was possible to lose their entire investment and deny that the disclosures were boilerplate. Defendants deny the allegations in sentence 2 of paragraph 44.

45.     In an April 28, 2016 email to the CRO, Caine admitted that "[t]he immediate straight answers to these questions are ugly …. Real ugly. Hell I would run." Nonetheless, Caine directed the CRO to work with Parvataneni and create a "tool for sales staff to respond to these questions" in a more positive light.

**ANSWER:**     Defendants note that the allegations of paragraph 45 refer to an email dated April 28, 2016. Defendants refer to the email dated April 28, 2016 for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 45 are not consistent with the email dated April 28, 2016, Defendants deny the allegations.

46.     In the same email, Caine told the CRO that "[t]his may be one of your more important accomplishments as CRO in 2016." Caine also insisted in a separate email to the CRO on the same day that LJM's response to the worst-case loss scenario "must have the CRO's name attached for credibility."

**ANSWER:**     Defendants note that the allegations of paragraph 46 refer to emails dated April 28, 2016. Defendants refer to the emails dated April 28, 2016 for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 46 are not consistent with the emails dated April 28, 2016, Defendants deny the allegations.

47.     LJM Management and LJM Partners followed Caine's directive; they addressed the subject of worst-case losses in a default due diligence questionnaire ("DDQ") that they disseminated to investors and/or their advisers, and in a "Risk Frequently Asked Questions" ("Risk FAQ") document distributed to their sales staff. LJM Management's and LJM Partners' sales staff were instructed to use the Risk FAQ to answer common questions about risk.

**ANSWER:**     Defendants deny the allegation in sentence 1 that LJM followed Caine's directive. Defendants also note that the allegations in sentences 1 and 2 of paragraph 47 refer to a DDQ and Risk FAQ. Defendants refer to the DDQ and Risk FAQ for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 47 are not consistent with the DDQ and Risk FAQ, Defendants deny the allegations.

*ACTIVE 58826746v13*

48.     Language from these documents also was inserted into emails to financial advisers who were considering investing in, or recommending that their clients invest in, the P&G Fund and/or the Private Funds. Caine, Parvataneni and the CRO all participated in the creation of the DDQ and the Risk FAQ, and Caine and Parvataneni were provided with the DDQ and Risk FAQ for their review prior to their use.

**ANSWER:**     Defendants note that the allegations of paragraph 48 refer to emails, a DDQ and Risk FAQ.  Defendants refer to the emails, DDQ and Risk FAQ for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 48 are not consistent with the emails, DDQ and Risk FAQ, Defendants deny the allegations.  Defendants deny in sentence 2 of paragraph 48 that Caine and Parvataneni participated in the creation of the referenced documents.

49.     Beginning on June 1, 2016, the DDQ stated:

> LJM employs a combination of scenarios to estimate risk to the portfolio assuming no risk mitigating actions may be taken …. The main basis of assumption is historical market behaviour such as the immediate market movement when Lehman Bros. failed in 2008, the electronic market Flash Crash in 2010 and the S&P downgrade of US debt in 2011. LJM calculates the effects of these market moves to formulate a worst case expectation for loss …. General worst case losses can run in the order of 20% for P&G and 30-35% for more aggressive flavors of the strategy.

**ANSWER:**     Defendants note that the allegations of paragraph 49 refer to the June 1, 2016 DDQ.  Defendants refer to the June 1, 2016 DDQ for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 49 are not consistent with the June 1, 2016 DDQ, Defendants deny the allegations.

50.     Beginning in or about June 2016, the Risk FAQ included similar worst-case daily loss estimates: "In the case of a market event so extreme that we are unable to trade (markets become illiquid or the breakers hit), LJM estimates the worst-case daily loss as follows: Aggressive, 40%; Moderately Aggressive, 30%; and Preservation and Growth, 20%."

**ANSWER:**     Defendants note that the allegations of paragraph 50 refer to June 2016 Risk FAQs.  Defendants refer to the June 2016 Risk FAQs for more complete and accurate statements

12

of their contents, and to the extent the allegations of paragraph 50 are not consistent with the June

2016 Risk FAQs, Defendants deny the allegations.

51.     Around October 2017, LJM Management and LJM Partners removed the reference to certain historical market scenarios from the funds' default DDQ but otherwise retained the same representation about worst-case loss estimates.

**ANSWER:**     Defendants note that the allegations of paragraph 51 refer to the October

2017 DDQs.   Defendants refer to the October 2017 DDQs for more complete and accurate

statements of their contents, and to the extent the allegations of paragraph 51 are not consistent

with the October 2017 DDQs, Defendants deny the allegations.

52.     Using the default DDQs and the talking points contained in the Risk FAQ, Defendants caused the worst-case loss estimates to be widely distributed to prospective investors and/or their investment advisers. In addition, Caine and Parvataneni personally told certain investors that worst-case losses for LJM Partners' more aggressive versions of the firm's investment strategy would not exceed 30-35%.

**ANSWER:**     Defendants admit the allegation in sentence 1 that DDQs, the Risk FAQ and

talking points contained therein were distributed to certain prospective investors and/or their

investment advisers.  Defendants deny the remaining allegations of paragraph 52.

53.     Defendants' statements regarding the calculation of worst-case loss estimates were false. In truth, their worst-case loss estimates were neither based on, nor consistent with, any stress testing performed by LJM Management and LJM Partners based on historical market scenarios.

**ANSWER:**     Defendants deny the allegations of paragraph 53.

54.     The 20% worst-case loss figure for the P&G Fund, for example, was computed by doubling the fund's worst single-day performance (which was around 9%), not by simulating or analyzing market movements of the magnitude experienced during past market disruptions (such as the 2008 credit crisis, 2010 Flash Crash, and the 2011 S&P downgrade of U.S. debt). The CRO, who drafted the 20% worst-case loss statement, has admitted that he doubled the P&G Fund's worst single-day performance and rounded up to 20% to arrive at the loss estimate disclosed to the fund's investors.

**ANSWER:**     Defendants deny the allegations of paragraph 54.

55.     Defendants' worst-case loss disclosures, moreover, did not match LJM's actual historical scenario-based stress testing. To the contrary, those stress reports consistently showed,

13

day-after-day and year-after-year, that the P&G Fund was exposed to losses greatly exceeding 20%, and that the Private Funds' loss exposure greatly exceeded 30-35%.

**ANSWER:** Defendants note that the allegations of paragraph 55 refer to a worst-case loss disclosures, stress reports and stress tests. Defendants refer to these documents for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 55 are not consistent with these documents, Defendants deny the allegations.

56. Each trading day, LJM automatically generated stress tests of the funds' portfolios based on certain scenarios. These stress tests were collected in a single excel file that was made available to LJM's portfolio managers (including Caine and Parvataneni). One spreadsheet within the file, entitled "Stress Scenario Report - Historical Scenarios," estimated portfolio losses or gains across eleven separate historical market events or "scenarios," including the three scenarios referenced in LJM's worst-case loss estimate disclosures (i.e., the 2008 credit crisis, the electronic market Flash Crash in 2010, and the S&P downgrade of United States debt in 2011).

**ANSWER:** Defendants admit the allegations in sentences 1 and 2 of paragraph 56. Defendants note that the allegations in sentence 3 of paragraph 56 refer to a worst-case loss disclosures, stress reports, stress tests and an excel file. Defendants refer to these documents for more complete and accurate statements of their contents, and to the extent the allegations in sentence 3 of paragraph 56 are not consistent with these documents, Defendants deny the allegations.

57. For each market scenario included in the report, the funds' portfolios were compared to defined movements in the S&P 500 Index and the CBOE Volatility Index ("VIX") related to that historical scenario. Based on these historical scenarios stress reports, the following table displays the highest, average, and lowest daily loss estimates for the P&G Fund during the 18 months preceding June 1, 2016:

**Historical Scenarios Stress Test Reports**
Start Date: 1/2/2015     End Date: 5/31/2016

|  | Black Monday Oct 87' | Gulf War Crisis | Peso Crisis | Asian Crisis | Failure of LTCM | 9/11/2001 | 2008 Credit Crisis | 2008 Market Recovery | Flash Crash 2010 | 2011 S&P Downgrade | 2015 Chinese Stock Collapse |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Highest Loss | -514.31% | -39.61% | -1.03% | -71.25% | -63.62% | -77.99% | -207.71% | -234.08% | -38.17% | -43.56% | -93.39% |
| Avg. Loss | -270.62% | -20.05% | -0.14% | -36.62% | -31.73% | -40.00% | -117.94% | -125.34% | -19.52% | -22.00% | -51.32% |
| Lowest Loss | -117.68% | -7.39% | 2.65% | -14.68% | -12.45% | -16.25% | -53.66% | -57.73% | -7.20% | -8.21% | -20.68% |

**ANSWER:** Defendants note that the allegations of paragraph 57 refer to historical

14

scenario stress reports. Defendants refer to the historical scenarios stress reports for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 57 are not consistent with the historical reports, Defendants deny the allegations.

58.     As shown in the preceding table, most of the historical scenarios included in LJM's internal stress testing reports projected losses for the P&G Fund that were significantly larger than the 20% worst-case loss disclosed to investors.

**ANSWER:**   Defendants note that the allegations of paragraph 58 refer to historical scenario stress test reports. Defendants refer to the historical scenario stress test reports for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 58 are not consistent with the historical reports, Defendants deny the allegations.

59.     Similarly, LJM's historical scenario stress testing for the more aggressive versions of its core strategy routinely projected losses significantly greater than the 30-35% worst-case loss disclosed to investors.

**ANSWER:**   Defendants state that the use of the word "projected" is vague and ambiguous and on that basis, Defendants deny the allegations in paragraph 59.

60.     Defendants did not create or maintain any other reports that stress tested the LJM portfolios based on historical market events or scenarios.

**ANSWER:**   Defendants deny the allegations of paragraph 60.

61.     Defendants knowingly or recklessly ignored their own stress testing reports, which consistently projected losses significantly greater than the estimates they had provided to investors. Defendants knowingly misrepresented the results of these reports to investors in the P&G Fund and the Private Funds.

**ANSWER:**   Defendants deny the allegations of paragraph 61.

**E.     Defendants Misrepresented Their Risk Management Practices.**

62.     Defendants built upon their false narrative regarding risk management by making additional misrepresentations to the Two Roads Board, to investors, and to investors' financial advisers.

**ANSWER:**   Defendants deny the allegations of paragraph 62.

*ACTIVE 58826746v13*

63.     Each year pursuant to Section 15(c) of the Investment Company Act, the Two Roads Board of Directors was responsible for evaluating LJM Management and deciding whether to renew the contract with LJM Management to be the P&G Fund's investment adviser. As part of that evaluation, LJM Management was required to provide the Board with accurate and truthful information. In particular, the Two Roads Board requested information regarding the type and frequency of LJM's risk reports, the manner in which LJM monitored and reported portfolio risks, and the manner in which risk reports were used to manage the P&G Fund's portfolios.

**ANSWER:** Sentence 1 of paragraph 63 asserts a legal conclusion and not an allegation against Defendants, and as such no response is required. Defendants admit the remaining allegations of paragraph 63.

64.     Caine and Parvataneni were responsible for reviewing LJM Management's responses to the Board's 15(c) requests, including ensuring the accuracy of the portions regarding risk management. LJM Management then provided these reports to the Two Roads Board.

**ANSWER:** Defendants deny the allegations in sentence 1 and admit the allegation in sentence 2 of paragraph 64.

65.     LJM Management's 15(c) responses stated that Caine, Parvataneni and the CRO reviewed four separate risk reports "several times during the day," including "reports that show portfolio performance given extreme market movements based in part on real historical data," and used those reports to manage the P&G Fund's portfolio and to inform their trading strategy.

**ANSWER:** Defendants note that the allegations of paragraph 65 refer to 15(c) responses. Defendants refer to the 15(c) responses for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 65 are not consistent with the 15(c) responses, Defendants deny the allegations.

66.     LJM Management's 15(c) responses also stated that the CRO monitored risk reporting to ensure that Caine and Parvataneni traded within established risk parameters, and that the P&G Fund's portfolio represented the same risks disclosed to investors. During one annual assessment, Parvataneni similarly affirmed to Two Roads' chief compliance officer that he used the historical scenarios stress test reports to monitor and manage risk.

**ANSWER:** Defendants note that the allegations of paragraph 66 refer to 15(c) responses. Defendants refer to the 15(c) responses for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 66 are not consistent with the 15(c)

*ACTIVE 58826746v13*

responses, Defendants deny the allegations.

67.     Defendants made similar statements in promoting their risk management practices to investors and to investors' financial advisers. In December 2016, LJM Management provided DDQ responses to a third party in an effort to make the P&G Fund one of the investment options on the third party's mutual fund platform. In those DDQ responses, LJM Management claimed that it utilized a daily report that monitored risk based on "various historical (*eg.* 2011 S&P Downgrade, etc.) scenarios" and further stated that its "[r]eview of these scenario analysis [sic] is incorporated into the fund's daily risk management and trading practices."

**ANSWER:**     Defendants note that the statement in sentence 1 that "Defendants made similar statements" is vague and ambiguous and on that basis, Defendants deny the allegations of sentence 1 of paragraph 67.  Defendants note that the remaining allegations of paragraph 67 refer to December 2016 DDQ responses.  Defendants refer to the December 2016 DDQ responses for more complete and accurate statements of their contents, and to the extent the remaining allegations of paragraph 67 are not consistent with the December 2016 DDQ responses, Defendants deny the allegations.

68.     These statements, however, were untrue. Defendants did not consult or rely on the automated stress test reports that were based on historical scenarios in order to manage risk, or to manage the P&G Fund's and the Private Funds' investment portfolios. In fact, during sworn testimony, Caine stated that he had never seen those reports during his time as portfolio manager.

**ANSWER:**     Defendants deny the allegations of paragraph 68.  Defendants further note that the allegations of paragraph 68 refer to sworn testimony.  Defendants refer to the sworn testimony for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 68 are not consistent with the sworn testimony, Defendants deny the allegations.

69.     Other than to comply with margin requirements imposed by their futures commission merchant, which provided them the liquidity needed to execute their strategy, LJM Management and LJM Partners did not have any established risk parameters.

**ANSWER:**     Defendants deny the allegations of paragraph 69.

17

**F.** **Defendants Falsely Claimed That They Maintained Consistent Risk Profiles.**

70.     Caine routinely told investors that LJM Management's and LJM Partners' analysis of investment risks and rewards depended upon the current volatility environment.

**ANSWER:**     Defendants deny the allegations of paragraph 70.

71.     Caine explained that periods of high volatility presented the best opportunities to generate investment income for the funds – by taking fewer positions, by taking positions further out-of-the-money, or simply by maintaining the same level of portfolio risk. By contrast, Caine explained that, in periods of low volatility, Defendants had to accept either lower income from option premiums or increased portfolio risk in order obtain the same returns for the funds.

**ANSWER:**     Defendants admit the allegations of paragraph 71.

72.     Caine also explained that during periods of low volatility, LJM's greatest vulnerability would be a spike in volatility. In light of the risk of a volatility spike, Caine assured investors that LJM would be cautious during periods of low volatility and that it would maintain a very consistent risk profile and patiently wait for a higher volatility environment.

**ANSWER:**     Defendants admit the allegations in sentence 1 and deny the allegations in

sentence 2 of paragraph 72.

73.     For example, during a LJM Partners quarterly webinar, held in or about January 2016, Caine stated: "The LJM portfolio and risk management teams will be cautious during periods of low volatility, utilizing additional hedging and risk mitigation, and we'll be opportunistic during periods of higher volatility." During this same webinar, Caine also stated: "Another frequent question that we brought up before that's been surfacing again is how can LJM profit in the low volatility environments we're experiencing? Basically, we must be patient, and we accept mildly lower returns when volatility is low."

**ANSWER:**     Defendants note that the allegations of paragraph 73 refer to a January 2016

webinar.  Defendants refer to the January 2016 webinar for more complete and accurate statements

of its contents, and to the extent the allegations of paragraph 73 are not consistent with the webinar,

Defendants deny the allegations.

74.     During a LJM Management quarterly webinar held in or about April 2017, Caine repeated the same basic sentiments: "LJM has previously commented that a low volatility environment is more challenging to generate good risk-adjusted returns. With VIX hovering in a very low range through Q1, and hitting a 10-year low in January, LJM must be patient and cautious and accept returns slightly below our target levels." During this same webinar, Caine further stated: "LJM is structuring portfolios to be cautious in a low vol environment, and be opportunistic in the

18

case of a market pullback."

**ANSWER:** Defendants note that the allegations of paragraph 74 refer to an April 2017 webinar. Defendants refer to the April 2017 webinar for more complete and accurate statements of its contents, and to the extent the allegations of paragraph 74 are not consistent with the webinar, Defendants deny the allegations.

75. Similarly, during a LJM Partners quarterly webinar held in or about July 2017, Caine reassured investors and/or their advisers: "LJM is focused on maintaining a very consistent risk profile in the current low volatility environment."

**ANSWER:** Defendants note that the allegations of paragraph 75 refer to a July 2017 webinar. Defendants refer to the July 2017 webinar for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 75 are not consistent with the July 2017 webinar, Defendants deny the allegations.

76. In DDQs disseminated to investors and/or their advisers beginning in mid-2017, Defendants repeatedly represented that LJM's "managing principle [was] to maintain a consistent portfolio risk profile."

**ANSWER:** Defendants note that the allegations of paragraph 76 refer to DDQs. Defendants refer to the DDQs for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 76 are not consistent with the DDQs, Defendants deny the allegations.

77. Beginning in October 2017 and continuing through early February 2018, however, Defendants repeatedly made investments that changed the risk profiles of LJM's portfolios and significantly increased the risk of loss in the P&G Fund and the Private Funds.

**ANSWER:** Defendants deny the allegations of paragraph 77.

78. During this period of time, which Defendants characterized as a low volatility environment or a "low volatility regime" in communications to investors and/or their advisers, Defendants attempted to obtain additional option premiums by: (a) writing more put options, (b) increasing the ratio of short-to-long put options, and (c) writing put options closer to the money. These efforts generated additional premium income for the funds, but they also increased the risk that the portfolios would suffer much larger losses in the event of a market dislocation.

**ANSWER:** Defendants deny the allegations of paragraph 78.

79. These actions were deliberate. Rather than being cautious and waiting patiently for a higher volatility environment, Caine and Parvataneni decided to carry increased risk in the LJM portfolios to try to meet return targets.

**ANSWER:** Defendants deny the allegations of paragraph 79.

80. Defendants did not disclose the increased levels of risk to the P&G Fund's or the Private Funds' current or prospective investors. To the contrary, in contemporaneous newsletters and other communications, they assured investors that LJM Management and LJM Partners were maintaining the "consistent risk profiles our clients expect."

**ANSWER:** Defendants deny the allegations in sentence 1 of paragraph 80. Defendants note that the remaining allegations of paragraph 80 refer to written newsletters and other communications. Defendants refer to the newsletters and other communications for more complete and accurate statements of their contents, and to the extent the remaining allegations of paragraph 80 are not consistent with the newsletters and other communications, Defendants deny the allegations.

81. For example, in a December 6, 2017 LJM Partners newsletter sent to LJM Partners' clients and Private Fund investors, Parvataneni stated that "the Investment Management team adjusted portfolios to maintain the consistent risk profiles our clients expect" and that the "Investment Management team has delivered consistent returns while maintaining risk parameters."

**ANSWER:** Defendants note that the allegations of paragraph 81 refer to an LJM Partners newsletter dated December 6, 2017. Defendants refer to the LJM Partners newsletter dated December 6, 2017 for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 81 are not consistent with the LJM Partners newsletter dated December 6, 2017, Defendants deny the allegations.

82. In a January 5, 2018 LJM Partners newsletter, Parvataneni stated that "LJM's the [sic] Investment Management team delivered consistent returns while maintaining long-term risk parameters" and that "LJM will manage portfolios with continued focus on harnessing the spread between implied and realized volatility while maintaining consistent risk levels."

20

**ANSWER:** Defendants note that the allegations of paragraph 82 refer to an LJM Partners newsletter dated January 5, 2018. Defendants refer to the LJM Partners newsletter dated January 5, 2018 for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 82 are not consistent with the LJM Partners newsletter dated January 5, 2018, Defendants deny the allegations.

83. In a January 8, 2018 LJM Management newsletter, Parvataneni stated that "LJM's Investment Management team delivered consistent returns while maintaining long-term risk parameters" and that "LJM will manage portfolios with continued focus on harnessing the spread between implied and realized volatility while maintaining consistent risk levels."

**ANSWER:** Defendants note that the allegations of paragraph 83 refer to an LJM Partners newsletter dated January 8, 2018. Defendants refer to the LJM Partners newsletter dated January 8, 2018 for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 83 are not consistent with the LJM Partners newsletter dated January 8, 2018, Defendants deny the allegations.

84. In a January 11, 2018 LJM Partners newsletter, Caine stated that "[i]n lower-volatility regimes, LJM will accept slightly lower returns in order to exercise prudent and consistent risk management."

**ANSWER:** Defendants note that the allegations of paragraph 84 refer to an LJM Partners newsletter dated January 11, 2018. Defendants refer to the LJM Partners newsletter dated January 11, 2018 for more complete and accurate statements of its content, and to the extent the allegations of paragraph 84 are not consistent with the newsletter, Defendants deny the allegations.

85. LJM Management's Annual Report filed with the SEC on January 11, 2018 contained a letter to P&G Fund investors signed by Parvataneni, which told investors that despite the "challenging conditions" and "headwind" of a low volatility environment, the firm delivered solid returns for the year "while maintaining risk parameters" and "rebalancing to retain a stable risk profile."

**ANSWER:** Defendants note that the allegations of paragraph 85 refer to an LJMFM's

Annual Report dated January 11, 2018. Defendants refer to the LJMFM's Annual Report dated January 11, 2018 for more complete and accurate statements of its content, and to the extent the allegations of paragraph 85 are not consistent with the Annual Report, Defendants deny the allegations.

86.     In the same letter, LJM Management and Parvataneni also assured investors that in the 2018 fiscal year, LJM Management would manage the P&G Fund portfolios "while maintaining consistent risk levels."

**ANSWER:**     Defendants note that the allegations of paragraph 86 refer to a written letter. Defendants refer to the letter for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 86 are not consistent with the letter, Defendants deny the allegations.

87.     In a January 17, 2018 LJM Management newsletter, Caine stated that "[i]n lower-volatility regimes, LJM will accept slightly lower returns in order to exercise prudent and consistent risk management."

**ANSWER:**     Defendants note that the allegations of paragraph 87 refer to an LJMFM newsletter dated January 17, 2018. Defendants refer to the LJMFM newsletter dated January 17, 2018 for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 87 are not consistent with the LJMFM newsletter dated January 17, 2018, Defendants deny the allegations.

88.     Defendants' promises of a risk-centric, not return-centric, investment strategy and related assurances that they would maintain, were maintaining, and had maintained a "consistent risk profile" were false. Beginning in the fourth quarter of 2017 and continuing into early 2018, Defendants had already ratcheted-up the risk in the portfolios of the P&G Fund and the Private Funds to unprecedented levels. The increased levels of risk in these portfolios were evident in multiple internal risk reports.

**ANSWER:**     Defendants deny the allegations of paragraph 88.

22

89.     Defendants maintained a report known internally as a "2D report," which was generated and made available to portfolio managers multiple times each trading day. The 2D report projected portfolio gains and/or losses based on standardized movements in the S&P 500 Index ("SPX") and implied volatility ("Vol").

**ANSWER:**     Defendants admit the allegations in sentence 1 of paragraph 89. Defendants further note that the allegations in sentence 2 of paragraph 89 refer to written 2D reports. Defendants refer to the 2D reports for more complete and accurate statements of their contents, and to the extent the allegations in sentence 2 of paragraph 89 are not consistent with the 2D reports, Defendants deny the allegations.

90.     In late 2017 and early 2018, Defendants' 2D reports showed dramatically elevated projected losses across the funds' portfolios that were far greater than in the past. More specifically, the 2D reports modeled estimated losses to the P&G Fund for multiple standardized scenarios (*e.g.*, a 5% drop in the S&P 500 and a 50% increase in implied volatility).

**ANSWER:**     Defendants note that the allegations of paragraph 90 refer to 2D reports. Defendants refer to the 2D reports for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 90 are not consistent with the 2D reports, Defendants deny the allegations.

91.     The following chart displays the projected losses for the P&G Fund as reflected in Defendants' internal 2D reports from January 2016 through February 2018 for the standardized scenario of a 5% drop in the S&P 500 and a 50% increase in implied volatility:



*ACTIVE 58826746v13*

**ANSWER:** Defendants note that the allegations of paragraph 91 refer to 2D reports. Defendants refer to the 2D reports for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 91 are not consistent with the 2D reports, Defendants deny the allegations.

92. From January 2016 through September 2017, the average estimated loss shown by Defendants' 2D reports for this scenario (-5% SPX / +50% Vol) was 17.6% (with a standard deviation of 5%). But from October 2017 to February 6, 2018, the average estimated loss nearly doubled to 34%, ballooning from 18.6% at the beginning of October to 61.4% by January 31st.

**ANSWER:** Defendants note that the allegations of paragraph 92 refer to 2D reports. Defendants refer to the 2D reports for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 92 are not consistent with the 2D reports, Defendants deny the allegations.

93. Similarly, from October 2017 to February 2018, the "Stress Scenario Report - Historical Scenarios" for the P&G Fund showed a sharp increase in estimated losses based on historical market movements as compared to prior periods. The average losses by quarter for the three specific historical scenarios referenced in LJM's 20% "worst case" loss estimate (*i.e.*, the 2008 credit crisis, the Flash Crash of 2010, and the S&P downgrade of U.S. debt in 2011), were as follows:

| Scenario | 2015 | | | | 2016 | | | | 2017 | | | | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Jan |
| 2008 Credit Crisis | -145.25 | -108.98 | -88.57 | -110.28 | -116.63 | -145.97 | -165.15 | -107.57 | -140.89 | -175.50 | -165.13 | -277.23 | -380.59 |
| Flash Crash 2010 | -24.48 | -13.87 | -15.84 | -18.79 | -22.45 | -23.01 | -22.98 | -14.06 | -18.25 | -20.83 | -19.24 | -33.26 | -50.04 |
| 2011 S&P Downgrade | -27.39 | -17.12 | -17.78 | -20.84 | -24.13 | -26.38 | -27.43 | -17.18 | -22.71 | -26.47 | -24.43 | -42.41 | -62.05 |

**ANSWER:** Defendants note that the allegations of paragraph 93 refer to Stress Scenario Reports. Defendants refer to the Stress Scenario Reports for more complete and accurate statements of their contents, and to the extent the allegations of paragraph 93 are not consistent with the Stress Scenario Reports, Defendants deny the allegations.

94. The change in the portfolio risk profile for the P&G Fund and the Private Funds

24

were apparent in other metrics as well, including "option Greek" metrics such as delta, gamma, theta and vega.

**ANSWER:**    Defendants deny the allegations of paragraph 94.

95.    Defendants' sales narrative emphasized that investment portfolios were adjusted to maintain a hedge against any overnight "gaps" in the S&P 500 Index.

**ANSWER:**    Defendants deny the allegations of paragraph 95.

96.    Caine often explained to investors that his trading strategy involved maintaining a short "delta" position in the portfolios, which meant that the funds' portfolios would provide a hedge against an overnight decline in the market. Caine also told investors that LJM Management and LJM Partners adhered strictly to portfolio risk metrics, including the "option Greeks."

**ANSWER:**    Defendants deny the allegations of paragraph 96.

97.    In late 2017 and early 2018, however, the end-of-day delta values for the P&G Fund became more consistently positive. This meant that the P&G Fund was no longer hedged against, and was more susceptible to, larger losses in the event of a downward market move.

**ANSWER:**    Defendants state that the words "more consistently positive" are vague and

ambiguous and on that basis, deny the allegations in sentence 1 of paragraph 97.  Defendants deny

the allegations in sentence 2 of paragraph 97.

98.    Similarly, during the same time-period, the P&G Fund experienced increases in the absolute value of its theta, vega and gamma. This meant that the fund had become much more sensitive to changes in volatility and passage of time, and that the portfolio's delta was more subject to rapid changes.

**ANSWER:**    Defendants admit the allegations in sentence 1 of paragraph 98.  Defendants

state that the phrase "much more sensitive" in sentence 2 is vague and ambiguous and on that

basis, deny the allegations in sentence 2 of paragraph 98.

99.    Additional metrics reflected the elevated risk levels of the LJM portfolios, including: (i) the short/long ratio (*i.e.*, the ratio of the number of short positions to the number of long positions in a portfolio); (ii) the total number of positions per equity dollar; and (iii) the "moneyness" of the positions in a portfolio (*i.e.*, how close the strike prices of the positions were to the then trading price of the underlying security).

**ANSWER:**    Defendants deny the allegations of paragraph 99.

100.    By at least December 2017, Defendants acknowledged in their internal correspondence that the risk profiles of the P&G Fund's and the Private Funds' portfolios had changed.

**ANSWER:**    Defendants note that the allegations of paragraph 100 refer to internal correspondence.  Defendants refer to the internal correspondence for a more complete and accurate statement of their content, and to the extent the allegations of paragraph 100 are not consistent with the internal correspondence, Defendants deny the allegations.

101.    In an email with an assistant portfolio manager dated December 27, 2017, Caine stated that he was "a bit scared of the main portfolios. They maintain a directional bias."

**ANSWER:**    Defendants note that the allegations of paragraph 101 refer to an email dated December 27, 2017.  Defendants refer to the email dated December 27, 2017 for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 101 are not consistent with the email dated December 27, 2017, Defendants deny the allegations.

102.    In this same email, Caine further stated that the portfolios were "long deltas," which indicated that they would suffer losses in the event of a decrease in the market.

**ANSWER:**    Defendants note that the allegations of paragraph 102 refer to an email dated December 27, 2017.  Defendants refer to the email dated December 27, 2017 for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 102 are not consistent with the email dated December 27, 2017, Defendants deny the allegations.

103.    Two days later, on December 29, 2017, Caine wrote another email stating that the "Portfolios are long deltas" and that the "Portfolios are directional."

**ANSWER:**    Defendants note that the allegations of paragraph 103 refer to an email dated December 29, 2017.  Defendants refer to the email dated December 29, 2017 for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 103 are not consistent with the email dated December 29, 2017, Defendants deny the allegations.

104.    In a January 12, 2018 email to Caine, with the subject line "Maybe not today, but

26

we should address," Parvataneni informed Caine that the "mutual fund" would be down 150 basis points, or 1.5%, month-to-date by the end of the day, and warned that "[w]e are very close to seeing a 2% to 2.5% losses for the month." Parvataneni proceeded to ask Caine in this email: "Should we cut and run for business reasons?"

**ANSWER:**     Defendants note that the allegations of paragraph 104 refer to an email dated January 12, 2018. Defendants refer to the email dated January 12, 2018 for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 104 are not consistent with the email dated January 12, 2018, Defendants deny the allegations.

105.    About an hour later, Caine responded to Parvataneni's email indicating his comfort with the risk level in the P&G Fund, stating in part: "Eyeballing the portfolio and the greeks,,,, seems AOK to me be patient." As part of his response to Parvataneni, Caine also emphasized the importance of being able to recover any losses, stating: "If it really looks horrible, restructure to a portfolio you like – but have a route to HWM [i.e., high water mark]."

**ANSWER:**     Defendants note that the allegations of paragraph 105 refer to an email dated January 12, 2018. Defendants refer to the email dated January 12, 2018 for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 105 are not consistent with the email dated January 12, 2018, Defendants deny the allegations.

106.    The increased risk and mounting losses in the P&G Fund in January 2018, triggered further discussions among Caine, Parvataneni, the CRO and other members of the LJM investment team about the portfolio management strategy going forward.

**ANSWER:**     Defendants deny the allegations of paragraph 106.

107.    For example, in or about the week of January 15, 2018, an internal meeting was held in LJM's Chicago office during which the increased levels of risk in the portfolios was discussed among Caine (who participated by phone), Parvataneni, the CRO and others. During this meeting, the CRO expressed concern about the potential losses that could result from the elevated risk levels. Parvataneni advised Caine that he could execute trades to reduce those risk levels, but explained (1) doing so would result in LJM booking losses, which (2) LJM was unlikely to recover before the end of the quarter, such that (3) LJM would have negative earnings for the first quarter of 2018 ("Q1 2018"). Caine rejected this course of action and instead decided that LJM would continue to carry increased risk levels in the LJM portfolios in order to give LJM a chance to have positive earnings for Q1 2018.

**ANSWER:**     Defendants admit the allegations in sentence 1 and deny the remaining

27

allegations of paragraph 107.

108.    On January 18, 2018, Caine and Parvataneni received an email from the CRO, with the subject line "Addressing Risk for the Next Two Weeks…," in which the CRO observed that LJM was trying to thread a needle from a risk perspective, stating:

> Well we have about 70 hours to manage through. From looking at risk, it is a very tight range we have for upside and downside, a needle to thread. Further moves to the upside of 1% will result in significant pressure in our short call positions across all maturities (but specifically both Feb maturities). Downside moves have a ton of gamma in addition to hefty elevation in vega. A similar 1% downside move will likely result in beta of well over 2 (so expect 2%+ losses) on P&G.

**ANSWER:**    Defendants admit that on January 18, 2018, Caine and Parvataneni received an email from the CRO.  Defendants note that the allegations of paragraph 108 refer to an email dated January 18, 2018.  Defendants refer to the email dated January 18, 2018 for a more complete and accurate statement of its contents, and to the extent the allegations of paragraph 108 are not consistent with the email dated January 18, 2018, Defendants deny the allegations.

109.    On or about January 19, 2018, Caine, Parvataneni, the CRO, and other investment team members, as well as marketing and sales personnel, participated in another meeting about the changed risk profile of the LJM portfolios. During this meeting, the CRO told Caine that the decision to maintain increased risk levels in the LJM portfolios could expose investors to higher volatility in returns. The CRO also advised Caine that the elevated risk levels in the LJM portfolios would continue through at least February 2018 unless LJM took action to reduce those risk levels. The CRO recommended reducing the risk levels of the LJM portfolios by closing positions and booking losses, and also requested authority to instruct the portfolio managers to cut risk and book losses if certain risk levels were reached. Parvataneni told Caine that he had a plan to cut risk in the LJM portfolios which could be implemented that same day. But in this second meeting, Caine again rejected the recommendation to reduce risk in the LJM portfolios by booking losses and again decided that LJM would continue to carry elevated levels of risk in the LJM portfolios to try to achieve a positive return in Q1 2018.

**ANSWER:**    Defendants admit the allegations in sentence 1 and deny the remaining allegations of paragraph 109.

**G.    The P&G Fund and the Private Funds Suffered Catastrophic Losses.**

110.    Defendants failed to manage the portfolios of the P&G Fund and the Private Funds in the manner described to investors and those funds suffered catastrophic losses.

28

**ANSWER:**    Defendants deny the allegations of paragraph 110.

111.    In early February 2018, over two consecutive trading days, Friday, February 2nd and Monday, February 5th, the S&P 500 Index fell more than 6%. During the same period of time, VIX increased 177%.

**ANSWER:**    Defendants admit the allegations in sentence 1 and deny the allegation in

sentence 2 of paragraph 111.

112.    At the close of trading on Monday, February 5, 2018, the futures commission merchant for the P&G Fund and the Private Funds ordered the liquidation of all remaining positions in order to meet margin requirements. The P&G Fund and the Private Funds suffered trading losses of more than $1 billion, or approximately 80% of their value. These losses resulted in the funds' total collapse and liquidation.

**ANSWER:**    Defendants deny the allegations of paragraph 112.

**H.**    **Defendants Benefitted Financially from Their Fraudulent Conduct.**

113.    Defendants all profited from their fraudulent conduct. During the time that Defendants utilized their false risk management marketing narrative, the P&G Fund and the Private Funds significantly increased their assets under management.

**ANSWER:**    Defendants deny the allegations of paragraph 113.

114.    The advisory fees collected by LJM Management and LJM Partners grew substantially. LJM Management's advisory fees grew 400% from 2015 to 2017. LJM Partners' advisory fees grew by 80% during the same period.

**ANSWER:**    Defendants admit the allegations of paragraph 114.

115.    Parvataneni also benefited personally because he received larger discretionary bonuses. In 2016 and 2017, Parvataneni received a six-figure salary and bonuses totaling more than $3 million. Parvataneni's 2017 bonus exceeded his 2015 bonus by nearly 400%.

**ANSWER:**    Defendants deny the allegations in sentences 1 and 3 and admit the

allegations in sentence 2 of paragraph 115.

116.    As the owner of LJM Management and LJM Partners, Caine was able to direct a large majority of the firms' profits to himself. During 2017 and 2018, Caine received distributions from LJM Management and LJM Partners totaling more than $15 million.

**ANSWER:**    Defendants deny the allegations of paragraph 116.

*ACTIVE 58826746v13*

117.    Notably, Caine extracted more than $5 million from LJM *after* the billion dollar sized losses described above to the funds he managed.

**ANSWER:**    Defendants deny the allegations of paragraph 117.

118.    On February 16, 2018, one week after investors in the P&G Fund suffered huge losses, Caine took a dividend of $2,425,000 from LJM Management. Prior to that date, Caine had never received a dividend from LJM Management.

**ANSWER:**    Defendants deny the allegations of paragraph 118.

119.    Also on February 16, 2018, one week after investors in the Private Funds similarly suffered huge losses, Caine took a dividend of $1,550,000 from LJM Partners. Caine proceeded to withdraw even more money from LJM Partners, including dividends of $92,488 and $1,139,179 on May 8 and 10, 2018, respectively.

**ANSWER:**    Defendants deny the allegations of paragraph 119.

<u>**COUNT I**</u>
*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder*
**(Against All Defendants)**

120.    The SEC realleges and incorporates by reference paragraphs 1 through 119 as if fully set forth herein.

**ANSWER:**    Defendants incorporate by reference their answers to paragraphs 1 through

119 as if fully set forth herein.

121.    Defendants, in connection with the purchase and sale of securities, by the use of the means and instruments of interstate commerce and by the use of the mails, directly or indirectly: (a) used and employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

**ANSWER:**    Defendants deny the allegations of paragraph 121.

122.    Defendants acted with *scienter* in that they knowingly or with severe recklessness made the material misrepresentations and omissions and engaged in the fraudulent conduct and/or scheme described above.

**ANSWER:**    Defendants deny the allegations of paragraph 122.

123.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act

[15 U.S.C. § 77j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

**ANSWER:** Defendants deny the allegations of paragraph 123.

## COUNT II
### *Control Person Liability Under Section 20(a) of the Exchange Act*
### **(Against Caine)**

124.   The SEC realleges and incorporates by reference paragraphs 1 through 119 as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference their answers to paragraphs 1 through

119 as if fully set forth herein.

125.   As alleged herein, LJM Management and LJM Partners violated section 10(b) of the Exchange Act [15 U.S.C. § 77j(b)].

**ANSWER:** Defendants deny the allegations of paragraph 125.

126.   At all relevant times, Caine was a control person of LJM Management and LJM Partners for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

**ANSWER:** Paragraph 126 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

127.   At all relevant times, Caine participated in, and exercised control over, the operations of LJM Management and LJM Partners, and also possessed the power and ability to control the acts constituting LJM Management's and LJM Partners' violations of the securities laws as alleged herein.

**ANSWER:** Defendants deny the allegations of paragraph 127.

128.   Accordingly, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Caine is jointly and severally liable with, and to the same extent as, LJM Management and LJM Partners for their violations of the Exchange Act alleged herein.

**ANSWER:** Defendants deny the allegations of paragraph 128.

## COUNT III
### *Violations of Section 17(a) of the Securities Act*
### **(Against all Defendants)**

129.   The SEC realleges and incorporates by reference paragraphs 1 through 119 as if fully set forth herein.

**ANSWER:**    Defendants incorporate by reference their answers to paragraphs 1 through 119 as if fully set forth herein.

130.    By engaging in the conduct described above, Defendants, in the offer or sale of securities, by use of the means or instruments of interstate commerce or of the mails directly or indirectly has:

> (a)    employed devices, schemes and artifices to defraud;
>
> (b)    obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or
>
> (c)    engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon purchasers or prospective purchasers.

**ANSWER:**    Defendants deny the allegations of paragraph 130.

131.    Defendants acted intentionally, with severe recklessness and at least negligently in the fraudulent conduct described above.

**ANSWER:**    Defendants deny the allegations of paragraph 131.

132.    By reason of the foregoing, Defendants violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)(1)-(3)].

**ANSWER:**    Defendants deny the allegations of paragraph 132.

<u>**COUNT IV**</u>
***Violation of Sections 206(1) and 206(2) of the Advisers Act***
**(Against All Defendants)**

133.    The SEC realleges and incorporates by reference paragraphs 1 through 119 as if fully set forth herein.

**ANSWER:**    Defendants incorporate by reference their answers to paragraphs 1 through 119 as if fully set forth herein.

134.    At all relevant times, LJM Management, LJM Partners, Cain and Parvataneni each acted as an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. Defendants LJM Management, Caine and Parvataneni owed the P&G Fund a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair

32

disclosure of all material facts, as well as a duty to act in the fund's best interests. Defendants LJM Partners, Caine and Parvataneni owed the Private Funds a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure of all material facts, as well as a duty to act in the funds' best interests.

**ANSWER:** Paragraph 134 asserts a legal conclusion and not an allegation against Defendants, and as such no response is required.

135. While acting as investment advisers, through use of the mails or means or instrumentalities of interstate commerce, Defendants LJM Management, LJM Partners, Caine and Parvataneni, directly or indirectly, singularly or in concert: (1) employed devices, schemes, and artifices to defraud a client or clients or prospective clients; and (2) engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon a client or clients or prospective clients.

**ANSWER:** Defendants deny the allegations of paragraph 135.

136. Defendants acted knowingly, recklessly and/or negligently by: (a) making misrepresentations of material fact, and failing to provide full disclosures of fact, to the P&G Fund and its investors, and to the Private Funds and their advisory clients; and (b) failing to act with reasonable care to avoid misleading the P&G Funds and its investors, and the Private Funds and their advisory clients, regarding trading strategy and/or the risk of loss.

**ANSWER:** Defendants deny the allegations of paragraph 136.

137. By reason of the foregoing, Defendants LJM Management, LJM Partners, Caine and Parvataneni have violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

**ANSWER:** Defendants deny the allegations of paragraph 137.

## COUNT V
### *Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8*
### **(Against LJM Management, Caine, and Parvataneni)**

138. The SEC realleges and incorporates by reference paragraphs 1 through 119 as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference their answers to Paragraphs 1 through 119 as if fully set forth herein.

139. At all relevant times, LJM Management, Caine and Parvataneni each acted as an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

33

**ANSWER:** Paragraph 139 asserts a legal conclusion and not an allegation against Defendants, and as such no response is required.

140. The P&G Fund is a "pooled investment vehicle[s]" as defined by Rule 206(4)- 8(b) [17 C.F.R. § 275.206(4)-8(b)].

**ANSWER:** Paragraph 140 asserts a legal conclusion and not an allegation against Defendants, and as such no response is required.

141. While acting as investment advisers, through use of the mails or means or instrumentalities of interstate commerce, Defendants LJM Management, Caine and Parvataneni, directly or indirectly, engaged in transactions, practices, and courses of business that were fraudulent, deceptive and manipulative.

**ANSWER:** Defendants deny the allegations of paragraph 141.

142. Defendants LJM Management, Caine and Parvataneni: (a) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors in the P&G Fund; and (b) engaged in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative with respect to investors or prospective investors in the P&G Fund.

**ANSWER:** Defendants deny the allegations of paragraph 142.

143. As a result, Defendants LJM Management, Caine and Parvataneni have violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

**ANSWER:** Defendants deny the allegations of paragraph 143.

<u>**COUNT VI**</u>
*Violations of Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder*
**(Against LJM Management)**

144. The SEC realleges and incorporates by reference paragraphs 1 through 119 as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference their answers to Paragraphs 1 through 119 as if fully set forth herein.

145. LJM Management had policies and procedures addressing risk management that

required its portfolio managers, its chief risk officer, and its chief compliance officer to help ensure that LJM Management incorporated its stated risk management practices into the firm's portfolio management. However, LJM Management failed to ensure that its risk management practices were consistent with statements to investors. LJM Management also failed to adopt and implement policies and procedures reasonably designed to prevent public statements by LJM Management and its personnel from being false and misleading. LJM Management had a general policy that prohibited fraud and deceit in communications, but lacked policies and procedures to implement this policy.

**ANSWER:** Defendants admit the allegation in sentence 1 and deny the remaining allegations of paragraph 145.

146. By engaging in the conduct described above, Defendant LJM Management provided investment advice to its clients without implementing written policies and procedures reasonably designed to prevent violation of the Advisers Act and the rules promulgated under the Advisers Act.

**ANSWER:** Defendants deny the allegations of paragraph 146.

147. By reason of the foregoing, LJM Management violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R § 275.206(4)-7].

**ANSWER:** Defendants deny the allegations of paragraph 147.

## COUNT VII
### *Violation of Section 15(c) of the Investment Company Act*
### *(*Against LJM Management and Parvataneni)

148. The SEC realleges and incorporates by reference paragraphs 1 through 119 as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference their answers to Paragraphs 1 through 119 as if fully set forth herein.

149. The P&G Fund is an "investment company" as defined by Section 3(a)(1) of the Investment Company Act [15 U.S.C. § 80a-3].

**ANSWER:** Paragraph 149 asserts a legal conclusion and not an allegation against Defendants, and as such no response is required.

150. Under Section 15(c) of the Investment Company Act [15 U.S.C. § 80a-15(c)], investment advisers of a registered investment company are required to furnish such information as may be reasonably necessary for fund directors to evaluate the terms of any contract whereby a

35

person undertakes regularly to serve or act as investment adviser of such company.

**ANSWER:** Paragraph 150 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

151. LJM Management's 15(c) responses for 2016 and 2017 provided to the Two Roads Board contained false and misleading statements about LJM Management's use of historical scenarios stress reports to manage the P&G Fund's portfolio. Parvataneni repeated these false statements as part of the Board's 15(c) review of risk management procedures.

**ANSWER:** Defendants deny the allegations of paragraph 151.

152. By reason of the foregoing, Defendants LJM Management and Parvataneni violated Section 15(c) of the Investment Company Act [15 U.S.C. § 80a-15(c)].

**ANSWER:** Defendants deny the allegations of paragraph 152.

## COUNT VIII
### Violation of Section 34(b) of the Investment Company Act
### (Against LJM Management and Parvataneni)

153. The SEC realleges and incorporates by reference paragraphs 1 through 119 as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference their answers to Paragraphs 1 through

119 as if fully set forth herein.

154. The P&G Fund is an "investment company" as defined by Section 3(a)(1) of the Investment Company Act [15 U.S.C. § 80a-3].

**ANSWER:** Paragraph 154 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

155. Under Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33], Defendants were prohibited from making any untrue statement of material fact in any registration statement or filing under the Investment Company Act, as well as from filing, transmitting, or keeping any document which omitted to state any fact necessary in order to prevent the statements made, in the light of the circumstances under which they were made, from being materially misleading.

**ANSWER:** Paragraph 155 asserts a legal conclusion and not an allegation against

Defendants, and as such no response is required.

36

156.    By engaging the conduct described above, Defendants LJM Management and Parvataneni made false and misleading statements in the P&G Fund's annual report for the fiscal year ended October 31, 2017, filed on Form N-CSR on January 11, 2018, because LJM Management had increased the risk in the P&G Fund's portfolio beginning in October 2017.

**ANSWER:**    Defendants deny the allegations of paragraph 156.

157.    Defendant Parvataneni signed the letter to shareholders contained in the Form N-CSR as the maker of the false and misleading statements, and LJM Management's seal appeared at the top.

**ANSWER:**    Defendants admit the allegation that Parvataneni signed the letter to shareholders contained in the Form N-CSR and that LJMFM's seal appeared at the top of the document and deny the remaining allegations of paragraph 157.

158.    By reason of the foregoing, Defendants LJM Management and Parvataneni violated Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33].

**ANSWER:**    Defendants deny the allegations of paragraph 158.

## <u>AFFIRMATIVE DEFENSES</u>

Defendants repeat, reallege, and incorporate herein by reference their responses to the allegations in Paragraphs 1 through 146 of the Complaint and plead their Affirmative Defenses:

### <u>FIRST AFFIRMATIVE DEFENSE</u>
### (Statute of Limitations)

The SEC's claims against Defendants are barred in whole or in part by the applicable statute of limitations, including 28 U.S.C. § 2462.

### <u>SECOND AFFIRMATIVE DEFENSE</u>
### (Good Faith Reliance on Advice of Expert Professionals)

The SEC's claims against Defendants fail in whole or in part because Defendants, in allegedly doing the acts complained of, relied in good faith upon the information, opinions, advice, reports, or statements made by attorneys, certificated public accountants, auditors, and other expert professionals.

### THIRD AFFIRMATIVE DEFENSE
### (Bespeaks Caution Doctrine)

The SEC's claims against Defendants fail in whole or in part because Defendants alleged misstatements were forward-looking and were accompanied by meaningful cautionary statements and risk disclosures, so as to be non-actionable under, among other things, the bespeaks caution doctrine. Defendants alleged misstatements or judgments constitute expressions of honest opinion or corporate optimism.

### FOURTH AFFIRMATIVE DEFENSE
### (Statements Made in Good Faith)

The SEC's claims against Defendants fail in whole or in part because the alleged misstatements were made in good faith, in the belief that such statements were accurate, that there was no omission of a material fact required to be disclosed or necessary to make any such statements not misleading, and that such statements were proper in all respects.

### FIFTH AFFIRMATIVE DEFENSE
### (Lack of Scienter)

The SEC's claims against Defendants fail in whole or in part because they did not act with the state of knowledge or intent necessary to give rise to liability. No act or omission of Defendants was malicious, willful, wanton, reckless or made with intent to violate any statute or law. Defendants acted at all relevant times in good faith, without scienter, and without actual knowledge that any of the alleged statements or omissions were false or misleading.

### SIXTH AFFIRMATIVE DEFENSE
### (No Fraudulent Conduct)

The SEC's claims against Defendants fail in whole or in part because they never obtained money or property by means of knowingly or negligently making or using untrue statements of

material fact and/or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

### SEVENTH AFFIRMATIVE DEFENSE
### (No Materiality)

The SEC's claims against Defendants fail in whole or in part because any alleged false statements, omissions or claims were immaterial.

### EIGHTH AFFIRMATIVE DEFENSE
### (Compliance with Laws)

The SEC's claims against Defendants fail in whole or in part because Defendants conduct was in compliance with, or authorized by, laws or regulations administered by a regulatory body or officer acting under state or federal statutory authority.

### NINTH AFFIRMATIVE DEFENSE
### (Acts by Third Parties)

The SEC's claims against Defendants fail in whole or in part because the occurrences alleged in the Complaint and all losses alleged, including those at Paragraphs 1 and 11 of the Complaint, if any, resulting therefrom were caused by the acts or omissions of third parties over whom Defendants had no control, including, but not limited to, market forces. Defendants conduct was not the proximate cause of any of the investor losses alleged by the SEC.

### TENTH AFFIRMATIVE DEFENSE
### (Information from Other Sources)

The SEC's claims against Defendants fail in whole or in part because any alleged false or misleading statements referenced in the Complaint were based on information supplied by other sources, which information Defendants believed to be true.

### ELEVENTH AFFIRMATIVE DEFENSE
### (No Likelihood of Future Violations)

The SEC's claim for injunctive relief is unavailable because (a) there has been no violation

of the securities laws, (b) any violations of law that may have occurred were not egregious, and (c) there is no likelihood of any future violations of securities law.  Thus, the SEC cannot establish that there is a reasonable likelihood that Defendants would violate the securities laws in the absence of injunctive relief.

**TWELFTH AFFIRMATIVE DEFENSE**
**(No Ill-Gotten Gains)**

The SEC's claim for disgorgement should not be granted because Defendants did not receive profits, ill-gotten gains or any form of pecuniary benefit that was derived from the alleged misconduct.

**THIRTEENTH AFFIRMATIVE DEFENSE**
**(No Duty to Disclose)**

The SEC's claims against Defendants fail in whole or in part because Defendants had no duty, under federal securities laws or otherwise, to disclose the information that the Complaint alleges was omitted or misstated.

WHEREFORE, Defendants Anthony Caine, Anish Parvataneni, LJM Funds Management, Ltd. and LJM Partners, Ltd. respectfully request that this Court enter a judgment in their favor and against Plaintiff Securities and Exchange Commission, award costs of suit and any other such further relief as this Court deems just and appropriate.

Dated: August 20, 2021

ANTHONY CAINE, ANISH
PARVATANENI, LJM FUNDS
MANAGEMENT, LTD. and LJM
PARTNERS, LTD.

By: /s/ *Steven M. Malina*
        One of Their Attorneys

        John F. Gibbons
        Jeffry M. Henderson
        Steven M. Malina
        Todd E. Pentecost
        Greenberg Traurig, LLP
        77 West Wacker Drive, Suite 3100
        Chicago, Illinois 60601
        Tel: 312-456-8400
        Fax: 312-456-8425
        gibbonsj@gtlaw.com
        hendersonj@gtlaw.com
        malinas@gtlaw.com
        pentecostt@gtlaw.com

        *Attorneys for Defendants Anthony Caine,*
        *Anish Parvataneni, LJM Funds*
        *Management, Ltd. and LJM Partners, Ltd.*

41

### CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on August 20, 2021, a true and correct copy of the foregoing **Defendants' Answer to the Complaint** was served electronically upon all counsel of record via the Electronic Case Filing system of the Court.

/s/ *Steven M. Malina*