**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-02859 |
| v. | Honorable Sunil R. Harjani |
| ANTHONY CAINE, ANISH PARVATANENI, LJM FUNDS MANAGEMENT, LTD. AND LJM PARTNERS, LTD., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

In this civil action, the SEC alleges that Defendants LJM Partners, Ltd. and LJM Funds Management, Ltd., under the direction of LJM owner, Anthony Caine, and LJM's Chief Portfolio Manager, Anish Parvataneni violated sections of the Exchange Act, the Securities Act, the Advisers Act, and the Investment Company Act, and the related rules by breaching their fiduciary duties and making false statements to investors related to the risks of their options trading strategy. More specifically, the SEC alleges that Defendants made false representations about their worst-case loss estimates and that they would maintain consistent risk levels, which contributed to the investors losing approximately $1 billion. Both the SEC and Defendants move for summary judgment. The SEC moves for summary judgement on Counts I-V and VIII, and on LJM's Eighth Affirmative Defense. Doc. [101]. Defendants move for summary judgment on all counts. Doc. [99]. For the reasons discussed below, Defendants' motion for summary judgment is denied and the SEC's motion for summary judgment is granted in part and denied in part.

1

**Background**

LJM Partners is a corporation based in Chicago, Illinois that was registered with the Commodity Futures Trading Commission as a Commodity Trading Advisor and a Commodity Pool Operator. LJM Funds Management was an SEC-registered investment adviser and a CFTC-registered commodity pool operator that was formed for the sole purpose of advising the public mutual fund, LJM Preservation and Growth Fund. Caine is the owner, founder, and chairman of LJM, and he worked closely with LJM's Chief Portfolio Manager, Anish Parvataneni, to manage the fund.

LJM implemented what is commonly known as a short volatility strategy. Doc. [124] ¶ 7. This means that LJM profited on the spread between the market's implied volatility and its realized volatility by buying and selling short and long options on the S&P 500. The buyer of an option risks losing the premium paid for the option, unless the market moves or volatility changes such that the option becomes profitable to exercise. The seller of an option is paid the premium upfront, but risks losing the difference between the premium received and the price it must pay to obtain the underlying security in the event the buyer exercises the option. LJM's profit came from investors willingness to transfer the risk of an extreme market event to LJM by paying LJM premiums for options. This was a market-neutral investment strategy, meaning LJM did not seek returns by predicting either rising or declining stock prices. LJM operated three variations of its investment strategy, each with varying targeted returns, degrees of risk and hedging: Preservation & Growth (utilized in the Preservation & Growth Fund), Moderately Aggressive, and Aggressive. Doc. [124] ¶ 8.

During 2017, there was a period of persistent low volatility in the market, which Defendants believed was likely to continue into 2018. Doc. [127] ¶¶ 92, 104. Because of the

structure of LJM's fund, during periods of low volatility LJM's portfolios were more susceptible to losses from a jump in volatility. Doc. [127] ¶ 94.

On February 5-6, 2018, the market took an unusual and severe drop, which resulted in significant losses to LJM's portfolios. Doc. [127] ¶ 156. By end of day, the P&G Fund suffered losses of approximately $424 million, equivalent to approximately 50% of its net assets. Doc. [127] ¶ 157. In total, in February 2018, LJM's portfolios suffered trading losses of over $1 billion. Doc. [127] ¶ 159.

In this case, the SEC alleges LJM made false and misleading statements to current and potential investors about the fund's worst-case loss estimates and about maintaining constant risk levels. The SEC claims that while LJM told investors that the worst-case loss estimate for the Preservation and Growth fund was 20% based on historical market behaviour, they arrived at that estimate without analyzing the specific historical events discussed with investors. Similarly, the SEC alleges that LJM repeatedly told investors that they would maintain consistent risk levels even in periods of low volatility, but in late 2017 and early 2018 LJM made trades that increased the fund's risk profile and left it susceptible to significant losses if there was a downturn in the market.

## Discussion

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court does not "weigh the evidence and determine the truth of the matter" but rather determines whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in [their] favor." *Id.* at 255. As discussed below, the Court reviewed the extensive briefing and evidence submitted by the parties on behalf of their respective summary judgment motions and finds there are disputed facts relevant to the claims that prevents either party from being entitled to judgment as a matter of law.

## I.    False Statements: Counts I, II, III, IV, V, and VIII

The SEC alleges that defendants made false and misleading statements in violation of Section 10(b) of the Exchange Act and Rule 10b-5 (Count I), Section 17(a) the Securities Act (Count III), Sections 206(1), (2), and (4) of the Advisers Act and Rule 206(4)-8 (Counts IV and V), Section 34(b) of the Investment Company Act (Count VIII).[1] The SEC alleges that there were two groups of false statements: worst-case loss estimates and consistent risk levels. The elements for the false statement claims vary slightly under each count,[2] but for the sake of evaluating the summary judgment motions, the elements at issue can be distilled down to three: (1) making a

---

[1] A statement is made when it is made to the public, here when the annual report was filed with the SEC. *See, e.g.*, *SEC v. Ustian*, 229 F. Supp. 3d 739, 755 (N.D. Ill. 2017) (relying on the date an annual report was filed with the SEC); *Anderson v. Abbott Lab'ys*, 140 F. Supp. 2d 894, 900 (N.D. Ill. 2001), *aff'd sub nom. Gallagher v. Abbott Lab'ys*, 269 F.3d 806 (7th Cir. 2001) (relying on the filing date for the annual report).

[2] To establish a claim under Section 10(b) in Count I, the SEC must prove Defendants: "(1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities." *McConville v. SEC*, 465 F.3d 780, 786 (7th Cir. 2006). As Caine's status as the control person under Section 20(a) is not disputed, liability for Count II turns on whether Count I was established. *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994). For Count III, the standard for Section 17(a) is substantially the same as § 10(b), except that § 17(a)(2) and (3) do not require scienter. *SEC v. Bauer*, 723 F.3d 758, 768 (7th Cir. 2013). Counts IV and V raise claims under Sections 206(1), 206(2), and 206(4) of the Advisors Act and Rule 206(4)-8, which are similar to, although broader than, Sections 17(a) and Section 10(b); the SEC is required to prove scienter for Section 206(1), but not Sections 206(2), and 206(4). *SEC v. Householder*, 2002 WL 1466812, at *6 (N.D. Ill. July 8, 2002), report and recommendation adopted, 2002 WL 31207292 (N.D. Ill. Oct. 1, 2002). Count VIII raises a claim under Section 34(b) which makes it unlawful to make an untrue statement in an annual report to the SEC or to omit material facts which are necessary in order to prevent the report from being materially misleading, but it does not require that omissions be willful. *SEC v. Advance Growth Cap. Corp.*, 470 F.2d 40, 51–52 (7th Cir. 1972).

false statement, (2) that is material to investors, (3) with scienter.[3]  The Court reviews each group of statements in turn.

### a.  Worst-Case Loss Estimates

The first set of statements the SEC alleges are false relate to LJM's worst-case loss estimates.  The parties do not dispute that Defendants distributed the worst-case loss estimates to prospective investors using the Due Diligence Questionnaire, the Risk FAQ, and the Investment Management Questionnaire. Doc. [137] ¶ 28.  Specifically, when describing the estimated maximum risk on the total portfolio and the method by which the risk is measured, LJM's Due Diligence Questionnaire dated June 1, 2016 stated:

> LJM employs a combination of scenarios to estimate risk to the portfolio assuming no risk mitigating actions may be taken. This is reflective of "gap" or "overnight" risk to the portfolio. The main basis of assumption is historical market behaviour such as the immediate market movement when Lehman Bros. failed in 2008, the electronic market Flash Crash in 2010 and the S&P downgrade of US debt in 2011. LJM calculates the effects of these market moves to formulate a worst case expectation for loss.

> LJM also assumes that it can maintain and manage portfolio risk during the course of regular trading. In this scenario, LJM assumes that it will hold certain portfolio risks at near constant levels for the market move assuming realization of certain losses.

> Finally, LJM breaks down the factors of loss, considering losses due to changes in underlying value and option volatility. LJM will attempt to strongly mitigate underlying value loss (delta and gamma exposure) while maintaining exposure to the implied volatility. Generally implied volatility is strongly mean reverting, but it is possible for very large movement.

> General worst case losses can run in the order of 20% for P&G and 30-35% for more aggressive flavors of the strategy. Losses related to volatility account for most of these losses.

> For severe market movement but allowing for regular trading, LJM will maintain consistent delta, gamma and vega exposures. Generally, this projects to losses on

---

[3] The Court notes that scienter is not required for claims brought under Section 17(a)(2) and (a)(3), Section 206(2), Section 206(4), and Section 34(b), instead a showing of negligence is sufficient.

the order of 5-10% for severe market movement for the given strategies where most of the losses are related to volatility.

Doc. [124] ¶ 83; Doc. [116-2] at 26.  It is also undisputed that starting in October 2017 in its Investment Management Questionnaire, LJM in response to the question "what is your worst-case scenario? How bad can it get?" LJM wrote:

> In the case of a market event so extreme that we are unable to trade (markets become illiquid or the breakers hit), LJM Partners estimates the worst-case daily loss as follows: Aggressive, 40%, Moderately Aggressive, 30%, and Preservation and Growth, 20%.
>
> NOTE: Worst-case loss is not the same as capital at risk. Investor's total capital is at risk; worst case loss is a daily loss estimate.

Doc. [137] ¶ 27; Doc. [103-5] at 30; Doc. [111-6] at 30.  The same language was used in LJM's Risk FAQ document. Doc. [111-2] at 3.  However, the parties dispute whether the statements were false, material, and if the Defendants acted with scienter.

### i.  **Falsity**

Turning first to whether the statements were false.  Although what LJM told investors is undisputed, the parties dispute how LJM calculated the estimated maximum risk.  For the reasons discussed below, there is a genuine dispute of material fact about how LJM arrived at its stated estimates, which is important to determining whether the statements were false.

Specifically, there is a critical factual dispute in how the worst-case loss scenarios were calculated.  Arjuna Ariathurai, the Chief Risk Officer, gave inconsistent testimony under oath when describing how he arrived at the estimates provided to investors.  The SEC relies on his 2018 SEC investigation testimony, in which he testified that to get the 20% estimate for the worst-case loss on the Preservation and Growth Fund, he doubled the losses from the fund's worst performing day. Doc. [105-19] at 212:16-213:25, 215:6-217:7, 219:3-23.  But, when he was later deposed for this case, Ariathurai testified that in doing his analysis for the worst-case loss estimates, he looked at

6

historical scenarios including the Lehman Brothers crash, the flash crash, the S&P 500 credit downgrade, and the China equity crash. Doc. [104-20] at 100:1-12. It is undisputed that Ariathurai alone was responsible for determining the worst-case loss estimates, so his testimony on how he did it is critical. Doc. [137] ¶ 41; Doc. [124] ¶ 130. If Ariathurai merely doubled the funds worst performing day, then the statements would be false. If instead he considered the historical scenarios, then the statements may not be false. Evaluating Ariathurai's testimony requires a credibility determination that is inappropriate for summary judgment. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011) (a district court cannot make credibility determinations on summary judgment). As whether the statements are false necessarily turns on what Ariathurai actually did, the Court cannot find in either parties' favor.

As a secondary issue, the parties dispute what reports and analysis LJM could have relied on to allow the statements about historical market behaviour to be true. The parties generally agree on the reports LJM created to analyze market data, although they dispute the meaning and usage of various reports.[4] Likewise, it is undisputed that LJM generated a report, titled "Stress Scenario Report - Historical Scenarios," showing how the value of LJM's current portfolios would change upon the reoccurrence of historically large S&P 500 price drops and associated Chicago Board Options Exchange Volatility Index spikes. Doc. [137] ¶ 30. This report was auto generated and made available to Parvataneni and others each trading day beginning in or about May 2015 and continuing until LJM ceased trading in February 2018. Doc. [137] ¶ 32.

The dispute is whether the Stress Scenario Report - Historical Scenarios Report was the only report LJM had that stress tested LJM's portfolios against the historical events referenced in the worst-case loss disclosures: 2008 Lehman Brothers failure, 2010 Flash Crash, 2011 S&P

---

[4] LJM utilized multiple risk management reports and tools to monitor and manage risk, including the CQG Reports, SPAN Emulator Reports, Risk Slides, 2D Reports, and Breakeven Reports. Doc. [124] ¶ 30.

Downgrade. The SEC contends that evidence shows that this was the only report that tested historical scenarios. Doc. [137] ¶ 33. LJM points to the 2D Report as providing their teams with the ability to model or stress test the portfolios against specific historical events, and that the 2D Reports subsumed or exceeded all historical events. Doc. [137] ¶ 33. LJM also offers its Margin Calculator as evidence that their analysis subsumed all of the historical events based on the actual S&P 500 and Chicago Board Options Exchange Volatility Index data related to events the SEC identified. Doc. [137] ¶ 33. Thus, there is a factual dispute about whether the tests and reports that LJM said it relied on analyzed historical event data in such a way as to make its statements about historical market behaviour being the main basis of the worst-case loss estimates true.

  ii. **Materiality**

The parties next dispute whether the worst-case loss estimates were material. The SEC asserts that they were material to investors because investors specifically asked for them, while LJM argues that they included cautionary disclosures warning investors that their entire capital was at risk making the estimates themselves immaterial.

Information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Materiality is "an inherently fact-specific finding[.]" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011) (quoting *Basic*, 485 U.S. at 236). As the Seventh Circuit has held "the determination of materiality requires delicate assessments of the inferences a reasonable investor would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the

trier of fact; thus a materiality determination is rarely appropriate at the summary judgment stage[.]" *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) (cleaned up).

It is undisputed that the worst-case loss estimates were created because investors asked for them. Doc. [124] ¶¶ 82, 86; Doc. [137] ¶¶ 22–23. It is also undisputed that LJM told investors their strategies included using futures contracts, which carried greater risks, and that an investors' total capital was at risk. Doc. [124] ¶¶ 65, 67, 69–72, 87; Doc. [127] ¶ 38.[5] However, the parties dispute how much weight should be given to those requests and whether the accompanying cautionary language makes any false statement related to the worst-case loss estimates immaterial.

Per the SEC, the fact that investors kept asking for these estimates, even after receiving disclosures that their entire investment was at risk, is evidence that the estimates were material to investors. Doc. [130] at 42. The SEC points out that investors asked for this information frequently enough that Caine directed Ariathurai to create a tool for LJM's sales staff to respond to these questions in a flattering light and that getting answers to these questions was "a VERY high priority for LJM." Doc. [137] ¶ 20; Doc. [112-4] at 3. Further, the SEC points to LJM having these statements in both the FAQ talking points and the due diligence materials is evidence that the Defendants understood this information was important to investors, and therefore material. Doc.

---

[5] Examples of this language can be found at Doc. [105-4] at 5 ("Futures contracts are subject to the same risks as the underlying investments that they represent, but also may involve risks different from, and possibly greater than, the risks associated with investing directly in the underlying investments." And "Adverse changes in the value or level of the underlying asset, reference rate or index can result in loss of an amount substantially greater than the amount invested in the derivative."). Likewise, the Investment Questionnaire stated, "In addition, because the investment vehicles utilized by LJM Partners inherently contain great risk, the source of funds in the LJM Partners account should consist solely of "risk capital" and should not be targeted for children's education, home purchases retirement, health or any of life's critical needs." Doc. [103-5] at 13. The Offering Memorandum, when discussing the options strategies' greatest risks, disclosed that "A third yet less frequently occurring risk factor is when markets sharply reverse direction (e.g. market sell-off followed by an immediate recovery. In this scenario it is possible that the LJM strategies could suffer losses exceeding that for the underlying S&P index." Doc. [103-9] at 15. LJM also communicated in Fact Sheets to potential and current investors that: "The risk of loss in trading commodities can be substantial, and may not be suitable for everyone." Doc. [107-9] at 3.

[130] at 42. The SEC argues that reasonable minds cannot differ as to the materiality of defendants' false and misleading statements about worst-case loss exposure. Meanwhile, LJM offers evidence that shows investors were warned that all their capital was at risk, so even if the worst-case loss estimates were false, as forward-looking statements, they were not material. Doc. [126] at 18. While the parties' arguments seem appealing at first when viewed in a vacuum, that approach is not correct for summary judgment.

LJM relies on the "bespeaks caution" doctrine, which is a legal principle which provides that "when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language, the forward-looking statements may not be misleading." *Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1404 (7th Cir. 1995). Under this doctrine the substantial disclosure of specific risks may render alleged misrepresentations concerning soft information immaterial and thus nonactionable as securities fraud. *Id.* However, this is a narrow fact-intensive defense that requires courts to evaluate whether the inclusion of the disclosure renders the alleged misrepresentation immaterial as a matter of law. To be sufficient, the cautionary language "must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Id.* at 1404-05.

Upon reviewing the documents, the Court cannot say that LJM's cautionary language is substantive and narrowly tailored to specific future projections that it renders the possibility of a misstatement in the worst-case loss estimates immaterial as a matter of law. For example, in the Investment Questionnaire, under the Risk and Leverage section, LJM states: "Like any equity investment, it's possible for a client to lose all their capital. However relative to equity markets (S&P 500), LJM Partners strategies have had better risk-adjusted returns (sharpe ratio) since the inception of each strategy." Doc. [103-5] at 29. But this disclosure is not directly related to the

10

worst-case loss estimates and is softened by LJM's statement that it has done better than the market.

On the next page, when addressing what the worst-case scenario would be, LJM wrote:

In the case of a market event so extreme that we are unable to trade (markets become illiquid or the breakers hit), LJM Partners estimates the worst-case daily loss as follows: Aggressive, 40%, Moderately Aggressive, 30%, and Preservation and Growth, 20%.

NOTE: Worst-case loss is not the same as capital at risk. Investor's total capital is at risk; worst case loss is a daily loss estimate.

Doc. [103-5] at 30; Doc. [111-6] at 30. While this cautionary language is provided alongside the estimates, it draws a distinction between the risks associated with the worst-case loss and the idea that an investor's total capital is at risk. This intentional separation between the risks prevents it from being narrowly tailored as a matter of law, and the decision must be left to the jury. The Court denies Defendant's motion for summary judgment on materiality and, as there are disputed facts related to whether the statements were false and if the Defendants acted with scienter, it is unnecessary to address the SEC's motion for summary judgment on materiality.

### iii. **Scienter**

Lastly, for Counts I, II, III, and IV[6] the SEC must establish Defendants acted with scienter, which requires intent to deceive, manipulate, or defraud. *Aaron v. SEC*, 446 U.S. 680, 686 n. 5 (1980). Generally, scienter is not appropriate for summary judgment. *P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770, 774 (7th Cir. 1986). Scienter can be shown either through intentional statements of known falsehoods or through the reckless disregard for the truth. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008). The Seventh Circuit defined recklessness for securities fraud as "an extreme departure from the standards of ordinary care ... to the extent that

---

[6] The Court notes that scienter is not required for the portion of these claims brought under Section 17(a)(2) and (a)(3), and Section 206(2), instead a showing of negligence is sufficient.

the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008) (quoting *Makor*, 513 F.3d at 704).

There are material disputed facts that prevent summary judgment on scienter, the most important of which concern whether the statements themselves were false. The Court cannot evaluate whether the Defendants acted with scienter until it is clear that the statements were false or misleading. While the parties make various scienter based arguments, which the Court discusses below, ruling on scienter is not appropriate at this time for this reason alone.

Beyond that, the SEC offers the fact that Defendants did not review or use the Stress Scenario Report - Historical Scenarios report to manage risks and that they never updated the worst-case loss estimates after Ariathurai initially did them in 2016 as evidence that they acted with scienter. The SEC also points out that Ariathurai knew that the worst-case loss estimate was not based on historical scenario stress testing, and that knowledge is imputed to LJM. Lastly, that LJM's actions in late 2017 and early 2018 were akin to a directional bet, despite LJM informing investors they would not do that. According to the SEC, these actions establish scienter.

The flaw in the SEC's argument is that it fails to acknowledge evidence that creates material disputes, which prevents summary judgment. The SEC relies on *SEC v. Lyttle*, to support their argument that a court can grant summary judgment in securities fraud cases even though scienter is not generally appropriate for summary judgment. 538 F.3d 601, 603–04 (7th Cir. 2008). However, this is not a case like *Lyttle*, in which there is no evidence to contradict the finding of scienter. In *Lyttle*, the defendants exercised their privilege against self-incrimination under the Fifth Amendment to not testify as to their state of mind. *Id.* Meaning all that was left was the SEC's "mountain of circumstantial evidence" and the inference of guilt from the defendants' refusal to testify. Therefore, the Seventh Circuit found that no reasonable jury could doubt that the defendants

12

acted with scienter. Here, however, there is evidence that contradicts the SEC's version of events. Both individual defendants testified about their lack of knowledge and intent and provided evidence of the personal losses they suffered because of the fund's collapse. Thus, there is room for a reasonable jury to doubt that they acted with scienter. Moreover, part of the SEC's argument turns on attributing to LJM the knowledge that its statements about the worst-case loss estimates were false. Doc. [130] at 47. However, as discussed above, there are disputed facts regarding whether the worst-case loss estimates were indeed false, and thus whether Defendants knew the statements were false.

Likewise, Defendants argument that they are entitled to summary judgment because they did not know the statements were false must also fail. Defendants assert that they were reasonable in believing that what they told investors was true because of Ariathurai's detailed analysis, so they lacked the required intent. Doc. [126] at 35. For the same reason the SEC cannot win, Defendants also cannot establish on undisputed facts that they were reasonable as they cannot establish what Ariathurai did. Ariathurai's conflicting testimony about what he did to create the worst-case loss estimates is a dispute that must go to the jury.

Defendants also remark on how they, along with their family and friends were heavily invested in the fund, and they suffered losses because of its collapse, which weighs against a finding of scienter. While this is surely a factor the jury can consider, Defendants do not identify any case law in which a defendant's personal losses were sufficient to grant summary judgment in an enforcement action by the SEC. Defendants instead point to cases brought under the PSLRA which creates a heightened pleading standard for private plaintiffs—to state with particularity facts giving rise to a strong inference of scienter—which does not apply to cases brought by the SEC. *See Antelis v. Freeman*, 799 F. Supp. 2d 854, 865–67 (N.D. Ill. 2011) (dismissing the complaint in

13

part because the parties were very close personally and defendant also bought into the venture); *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (affirming dismissal of a PSLRA complaint when defendants also stood to lose a lot of money when the stock price fell). As their personal losses are only a factor in determining whether there was scienter, the Court cannot weigh this evidence against competing evidence presented by the SEC that could establish scienter when considering a motion for summary judgment.[7]

### b. Consistent Risk Levels

The second group of statements the SEC alleges are false were representations to investors that LJM would maintain consistent risk levels. Specifically, LJM assured investors that during periods of low volatility, LJM would not elevate risk levels or the risk profile of its portfolios to generate returns. Doc. [127] ¶ 97. The statements to investors, listed below, are not in dispute:

- November 6, 2017 LJM Partners Newsletter: "The LJM Investment Management team continues to manage the portfolios with an eye toward maintaining consistent risk levels regardless of market direction or volatility level." (Parvataneni)

- December 6, 2017 LJM Partners Newsletter: "As markets moved, the Investment Management team adjusted the portfolios to maintain the consistent risk profiles our clients expect" and "delivered consistent returns while maintaining risk parameters." (Parvataneni)

- January 5, 2018 LJM Partners Newsletter: "LJM is pleased with 2017 performance in a year characterized by a market "melt up" and persistent low volatility. This market condition creates a headwind for the strategy. LJM's Investment Management team

---

[7] The parties devote little time in their extensive briefing to the issue of negligence, instead they largely wrap their arguments into the issue of scienter. The only separate argument is that LJM asserts that the SEC failed to establish the standard of care that Defendants violated to establish the negligence claims. LJM relies on *SEC v. Shannahan*, 646 F.3d 536 (8th Cir. 2011) and *SEC v Ginder*, 752 F.3d 569 (2d Cir. 2014) to argue that the SEC must have established a standard of care, however, neither of these cases supports their argument. In *Ginder*, the Second Circuit reversed a judgment as a matter of law in favor of the SEC, when no evidence was presented to support a negligence theory and the SEC only argued intent and recklessness which the jury rejected. 752 F.3d at 576. In *Shannahan*, the Eighth Circuit affirmed the defendant's motion for judgment as a matter of law because the SEC failed to present any evidence at trial that the defendant violated his fiduciary duties. 646 F.3d at 546. As there is no basis to grant Defendants' motion on these cases, the Court will not separately consider arguments about negligence and instead refer to the parties' scienter arguments.

delivered consistent returns while maintaining long-term risk parameters. … LJM will manage portfolios with continued focus on harnessing the spread between implied and realized volatility while maintaining consistent risk levels." (Parvataneni)

- January 8, 2018 LJM Funds Management Newsletter: "LJM is pleased with 2017 performance in a year characterized by a market "melt up" and persistent low volatility. This market condition creates a headwind for the strategy. LJM's Investment Management team delivered consistent returns while maintaining long-term risk parameters. … LJM will manage portfolios with continued focus on harnessing the spread between implied and realized volatility while maintaining consistent risk levels." (Parvataneni)

- January 11, 2018 (Filing Date) – P&G Fund 2017 Annual Report: "The Investment Management team will manage the portfolios with continued focus on harnessing the spread between implied and realized volatility while maintaining consistent risk levels." (Parvataneni)

- January 11, 2018 LJM Partners Annual Newsletter /January 17, 2018 LJM Funds Management Annual Newsletter: "In lower-volatility regimes [like 2017], LJM will accept slightly lower returns in order to exercise prudent and consistent risk management." (Caine)

Doc. [127] ¶ 99.[8]

While the statements made to investors are not disputed, the parties dispute whether the statements were false or misleading, whether the statements were material to investors, and whether Defendants acted with scienter.

Before diving into the disputes, it is first important to understand some of the industry terminology. In particular, the Option Greeks—delta, vega, theta, and gamma—are commonly used risk measurements, which are often referenced by the parties in this case. Doc. [124] ¶ 46. Delta measures how much an individual option position could be expected to change given a one point move in the underlying security. Gamma measures how much the delta could be expected to change if the price of the S&P Futures changes by 1 point. Vega measures the amount that an option price could be expected to change in relation to a 1-point change in the volatility of the underlying security. Theta measures the value an option could be expected to change over time.

---

[8] This is not an exhaustive list of statements regarding consistent risk profiles that the SEC alleges are false.

15

The Greeks can be measured by valuing the options in a portfolio and then revaluing the entire portfolio in response to changes in price, volatility, or time to expiration. While it is undisputed that LJM calculated the Greeks for the positions in their portfolio, the degree to which LJM relied on the Greeks as a risk metric is disputed and relevant to whether the statements were false, as further discussed below. Doc. [124] ¶ 47.

### i. **Falsity**

The arguments over whether the statements regarding LJM maintaining consistent risk levels were false boils down to what risks did Defendants stated they considered, what risks Defendants actually considered, and were those risk consistent during the relevant time period. LJM argues that they told investors these were discretionary funds and since they did not define what it meant to maintain a consistent risk profile, it was within their discretion to decide what risks to consider. Doc. [100] at 38–39. LJM claims that in their discretion, they evaluated risks using their primary risk parameters and that in late 2017 and early 2018, those risks were consistent and therefore their statements were not false. In contrast, the SEC contends that LJM was still bound to act consistent with the strategies disclosed to investors. According to the SEC, the Option Greeks and 2D Report showed elevated risks and that Defendants' testimony regarding LJM's risk parameters is not credible.

Turning first to the issue of discretion. Despite agreeing that the funds were discretionary, they dispute what that entitled LJM to do. Doc. [124] ¶¶ 22, 93–94. The SEC points to evidence that shows this required them to adhere to the risk management policies and strategies they disclosed to investors, and it did not grant them unlimited discretion to structure the investment portfolio. Doc. [124] ¶¶ 23, 93–94; Doc. [103-14] at 353:3-18. According to the SEC, LJM's risk policy contemplated "mandated risk controls" which were to "take the form of measured risk limits

16

or certain actions and states that are disallowed at LJM." Doc. [124] ¶ 23; Doc. [113-12] at 3. However, LJM asserts that this discretion allowed them to manage the fund based on their primary risk metrics (SPAN[9] and Breakevens) over the secondary risk metrics (Greeks). Doc. [136] at 18.

Crucial to this analysis is what risk metrics, if any, LJM told its investors it would rely on. The SEC points to Caine's statements during the Q1 2017 webinar in response to a question on LJM's risk management process as evidence that LJM told investors they were relying on the Greeks as risk metrics. Doc. [124] ¶ 23. Caine stated that "LJM does not take a directional bias in the market, and we strictly adhere to risk metrics that include the analysis of the delta, gamma and vega within our portfolio. If we were violating any of our metrics, regardless of where the market is, then we will make the adjustments for risk adherence." Doc. [106-22] at 12:19–13:14.

LJM counters that it never defined "consistent risk profile," "consistent risk levels," or "consistent risk management" for investors or promised them what metrics would be used. Doc. [100] at 39. According to LJM, it was acting within its discretion to determine what risks to assess and the only risk metric specifically disclosed to investors was the SPAN range. Doc. [100] at 39; Doc. [124] ¶¶ 162–63; Doc. [108-24] at 15.[10] On LJM's Investment Management Questionnaire, they told investors that they approach "risk management through quantitative portfolio and market analysis" and that they used global macro analysis, core market analysis, and portfolio risk. Doc.

---

[9] The parties dispute what exactly SPAN stands for and calculated, but both use the phrase SPAN throughout their brief, so the Court uses it here.

[10] The SEC argues that this was not a disclosure of using the SPAN range as a risk management metric because it was about the "use of proceeds" that did not include a reference to risk metrics or SPAN range. The SEC also notes that this was a disclosure for the P&G Private Fund, which was different than the P&G Fund at issue here. Doc. [124] ¶ 163. Defendants respond that the P&G Private and Public funds were run identically. Doc. [136] at 17–18. However, even if the funds were run identically behind the scenes, the issue remains as to what investors were told.

[103-5] at 20. As evidenced above, there is a clear dispute of material fact as to what investors were told about what consistent risk levels meant.

Next, LJM contends that most of the statements the SEC identified are forward-looking goal statements that were not promises to investors and cannot be false. Doc. [100] at 40. First, contrary to LJM's arguments, courts have repeatedly held that the limitation on liability for forward looking statements does not apply to enforcement actions brought by the SEC.[11] Second, LJM's statements are not predictions of what will happen but statements about what they will continue to do. *SEC v. Kameli*, 2020 WL 2542154, at \*20 (N.D. Ill. May 19, 2020) (finding that representations to investors about program compliance were not predictions or forecasts about the funds future and became false or misleading when the alleged misconduct began). These statements reflect LJM's current and continued conduct: "LJM will manage portfolios with continued" and "team adjusted the portfolios to maintain the consistent risk profiles our clients expect." Doc. [127] ¶ 99. As discussed further below, it is disputed whether these statements were true when made or

---

[11] Defendants misrepresent that *SEC v. e-Smart Tech., Inc.*, 31 F. Supp. 3d 69, 84 (D.D.C.2014), granted a "motion to dismiss where defendant expressly relied on safe harbor provision of PSLRA," Doc. [136] at 17, when in fact the court denied the motion to dismiss and expressly rejected the argument that the limitation applied to actions brought by the SEC. Defendants also misrepresent the case law when arguing that a court attempted to apply the forward looking statements rule in cases brought by the SEC, when in actuality the court rejected attempts to rely on the safe harbor provisions while also finding that the statements were not forward looking. *See SEC v. Strategic Glob. Invs., Inc.*, 262 F. Supp. 3d 1007, 1020–21 (S.D. Cal. 2017) (finding that the safe harbor provisions did not apply to the SEC and rejecting defendants' argument that the statements were forward looking). Defendants also rely on *SEC v. Bluepoint Inv. Couns., LLC*, 2021 WL 719647, at \*18–19 (W.D. Wis. Feb. 24, 2021), which stated the PLSRA limitation of liability for forward looking statements only applied to private actions, but noted that forward looking statements may not be actionable if they were reasonable when made, relying on *Eckstein v. Balcor Film Inv'rs*, 8 F.3d 1121, 1132 (7th Cir. 1993), a case involving a private action brought before the enactment of PSLRA; however, the court found that the SEC alleged facts demonstrating the statements were not reasonable when made. Similarly, the court in *SEC v. DeFrancesco*, 699 F. Supp. 3d 228, 240 (S.D.N.Y. 2023), relied on Second Circuit precedent in a pre-PSLRA private action, to find that even assuming the statements were forward looking that there were materially disputed facts as to whether the defendants could reasonably believe the statements.

whether the Defendants had already, as the SEC argues, stopped maintaining consistent risk levels. Therefore, summary judgment cannot be granted to Defendants on this basis.

Just as it is disputed what LJM told investors by maintaining consistent risk levels, it is similarly disputed what LJM actually considered when analyzing risks. As an initial matter, the parties dispute whether LJM had any hard risk limits or soft risk limits. Doc. [124] ¶ 35. Defendants offer witness testimony that shows LJM monitored and adjusted for hard limits and soft limits. Doc. [124] ¶ 35; Doc. [103-7] at 146:3-22, 151:3-152:15, 156:10-157:24; Doc. [104-9] at 398:2-400:3. Also, that LJM maintained hard limits for: (i) SPAN, which were set by LJM's futures commission merchants; (ii) not allowing the spot market to breach LJM's breakeven levels; (iii) not allowing a short option to come into the money; (iv) only executing options dated four months out or closer. Doc. [104-21] at 215:10-216:1.

The SEC notes that while LJM's Risk Policy contemplated hard and soft risk limits, it did not set or define what those limits were. Doc. [124] ¶ 35; Doc. [113-12] at 3. The SEC points to the fact that LJM maintained no documents reflecting the existence of any hard or soft risk limits. Doc. [124] ¶ 35; Doc. [104-12] at 139:19-24, 141:1-4, 18-24, 144:10-20; Doc. [104-21] at 217:25-218:4, 227:5-11, 228:23-25; Doc. [104-9] at 400:17-25. Further, the SEC notes that the Defendants' testimony regarding the existence of hard and soft risk limits changed multiple times during this litigation. Doc. [124] ¶ 35. Initially, Caine, Parvataneni, and Ariathurai each testified that the only hard risk limit was margin. Doc. [103-11] at 143:15-24; Doc. [125-3] at 214:20-215:7; Doc. [106-4] ¶ 27. But later Caine testified that LJM had three hard limits: SPAN, a Breakeven profitability analysis, and never letting a short option expire in-the-money. Doc. [104-12] at 128:24-133:13, 151:9-153:1. Parvataneni also testified at his later deposition that LJM had three risk limits: SPAN, Breakeven, and never selling options greater than 3-months in duration. Doc.

[103-7] at 151:3-152:14. Then, when Caine was testifying as the 30(b)(6) witness, he said LJM had five hard risk limits: SPAN, Breakeven, never let an option become in-the-money, only trade options expiring within 4-months, and adhering to any risk limits imposed by LJM's futures commission merchants. Doc. [104-21] at 215:13-216:10. The SEC also notes that Defendants testimony regarding the existence and number of soft risk limits has similarly been inconsistent. Doc. [124] ¶ 35. As both parties provided evidence to support their argument about whether or not LJM had risk parameters, there is an evident dispute of material facts which the Court cannot decide on summary judgment. The question of whether LJM used hard and soft risk limits must be decided by the jury.

Another key dispute between the parties is how important the Option Greeks were to evaluate LJM's risk levels. Doc. [127] ¶ 46. The SEC identified evidence that shows that LJM measured the risk profile of each fund, in part, by assessing the Greeks, and told investors they would use the Greeks. Doc. [105-19] at 65:7-67:21; Doc. [127] ¶ 53. Also, that Parvataneni testified that delta was a primary risk. Doc. [104-9] at 408:23-25. In contrast, LJM references evidence showing that the Greeks were secondary metrics, and they instead relied on the Breakeven Reports to evaluate their portfolio, which reflected normal ranges in light of market conditions in January 2018. Doc. [124] ¶ 171; Doc. [104-9] at 464:17-465:18, 495:23-496:6, 497:6-498:21; Doc. [108-25]. The SEC counters that LJM does not define "portfolio metrics" or "normal ranges" as they relate to the Breakeven reports. Doc. [124] ¶ 171. The SEC asserts that the evidence LJM points to, an email from Caine and Parvataneni's testimony, does not explain what was good about the breakevens in January and should not be relied on as evidence. Doc. [124] ¶ 171. The SEC further argues that LJM's witness testimony that they relied on these other metrics was a post-hoc justification created during the litigation, because there is no documentation

to support these claims. Doc. [130] at 36–38. Given the weight of the evidence presented by both parties, the veracity of LJM's statements regarding maintaining consistent risk levels once again precludes summary judgment.

### ii. **Materiality**

The parties also dispute whether the statements about maintaining consistent risk levels were material to investors. While Defendants claim that the statements were too vague to be material, the SEC maintains that Defendants marketed their adherence to consistent risk levels as an essential feature of their pitch to investors and that those assurances were material. As the Court described the materiality standard above, it will not repeat it here beyond acknowledging that information is material if it would have significantly altered the total mix of information available and that materiality determinations are rarely appropriate for summary judgment. *Basic*, 485 U.S. at 231–32; *Marks*, 122 F.3d at 370.

LJM repeatedly told investors that it would maintain consistent risk levels in monthly newsletters and annual reports. Doc. [127] ¶ 99. Unlike language typically considered to be puffery, which is non-specific and expresses only vague optimism, these statements lay out a clear plan of action to be taken by the Defendants based on current and past actions. *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021). LJM repeatedly told its investors that it would "maintain consistent," as in continue doing what they have been doing, the "risk levels" for the fund. Risk is not an amorphous term when discussing trading options. As described in depth above, there are numerous methods to calculate and analyze risks related to option funds, so how a fund handles risk is a relevant consideration for investors.

LJM relies on *Searls v. Glasser*, where the Seventh Circuit found that "recession-resistant" was too vague to constitute a material statement and that its lack of specificity precludes it from

being material as it contained no useful information. 64 F.3d 1061, 1066 (7th Cir. 1995). LJM also relies on *Appert v. Morgan Stanley Dean Witter, Inc.*, where the Seventh Circuit found that improperly inflating a fee to include profits was not material. 673 F.3d 609, 616–17 (7th Cir. 2012). But statements about maintaining a consistent risk profile are not analogous to generalized statements about recessions or fees; measuring risk is central to an investment strategy when operating in the options market, as LJM did. Such statements cannot be summarily deemed as a matter of law too vague to be material to investors. The Court denies Defendant's motion for summary judgment on materiality and, as there are disputed facts related to whether the statements were false and if the Defendants acted with scienter, it is unnecessary to address the SEC's motion for summary judgment on materiality.

### iii. **Scienter**

As described above, for Counts I, II, III, and IV[12] the SEC must establish the Defendants acted with scienter.[13] As there are disputed facts regarding whether the consistent risk levels statements are false, the Court cannot grant summary judgment on whether the Defendants' acted with scienter. While the SEC points to evidence that shows Defendants knew downside risk had increased and that the Greeks showed elevated risks,[14] they have not established on undisputed facts that those were the risks Defendants referred to in the statements. Similarly, that evidence prevents Defendants from establishing that they were not intentionally or recklessly making false statements.

---

[12] The Court notes that scienter is not required for the portion of these claims brought under Section 17(a)(2) and (a)(3), and Section 206(2), instead showing negligence is sufficient.

[13] The parties raised many of the same scienter arguments as they did for the worst-case loss estimates. For the reasons stated above, the Court denies summary judgment to either party on those grounds.

[14] Doc. [127] ¶¶ 139, 142, 148–51, 153; Doc. [124] ¶¶ 101–04; Doc. [113-3].

Additionally, Defendants reference their actions in January 2018 to reduce risk as evidence that prevents a finding of scienter because they were taking actions that they believed were necessary to reduce the risk they thought was the most threatening at the time. Doc. [100] at 50. However, there are disputed facts regarding what Defendants knew about the risks that existed and which risks they were considering in January 2018.  While Defendants point out that they were worried about and made trades to address upside risk, the SEC identified evidence showing elevated downside risk existed at the time, that Defendants had previously warned investors about downside risks, and that Defendants were cognizant of the elevated downside risks. Doc. [124] ¶ 98.  This dispute prevents summary judgment on the issue of scienter.  Further, Defendants cited cases do not establish precedent for granting them summary judgment on this basis. *See Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (affirming dismissal under the PSLRA in part because the defendants promptly investigated upon learning about the accusation of fraud and disclosed its findings to the public); *Flannery v. SEC*, 810 F.3d 1, 4, 11–12 (1st Cir. 2015) (vacating the Commission's order against defendants after reviewing and weighing evidence presented at an 11-day hearing).  Thus, there are material disputed facts for each of the necessary elements of the SEC's false statement claims which prohibit summary judgment on Counts I-V and VIII.

## II.  **Count VI**

In Count VI, the SEC alleges that LJM Funds Management violated Section 206(4) of the Advisors Act and Rule 206(4)-7, because they failed to ensure that their risk management practices were consistent with statements to investors and to adopt and implement policies to prevent false statements to investors.  Under Section 206(4) of the Advisers Act, investment advisors cannot make false or misleading statements of material fact to investors in a pooled investment vehicle. Rule 206(4)-7 requires investment advisers to "[a]dopt and implement written policies and

procedures reasonably designed to prevent violation[s]" and to review at least annually the adequacy and effectiveness of these policies and procedures. 17 C.F.R. § 275.206(4)-7. Failure to maintain adequate compliance policies and procedures constitutes a violation. "Rule 206(4)-7 does not enumerate specific elements that advisers must include in their policies and procedures." Compliance Programs of Investment Companies and Investment Advisers, 68 FR 74714-01. Instead, advisors "should adopt policies and procedures that take into consideration the nature of that firm's operations." *Id.* LJM moved for summary judgment arguing that they had policies and practices to ensure risk management.

While LJM points to some evidence in its favor, there are disputed facts regarding the adoption and implementation of risk management policies that prevent summary judgment. For example, LJM Funds Management identified policies and presentations given to employees, but, as the SEC notes, some of these policies were for LJM Partners, not LJM Funds Management, and mere existence of the policies does not establish that all employees were trained on these policies. Doc. [124] ¶¶ 15–16. The SEC also disputes LJM's claims that evidence shows they conducted mock audits or had a third-party review in 2016. Doc. [124] ¶ 18. As factual disputes exist as to the adoption and implementation of risk management policies at LJM Funds Management, the Court denies Defendants' motion for summary judgment on Count VI. *See SEC v. Criterion Wealth Mgmt. Servs., Inc.*, 599 F. Supp. 3d 932, 959 (C.D. Cal. 2022) (denying summary judgment on Section 206(4) and Rule 206(4)-7 claims when there was disputed evidence regarding why the defendant failed to update the policy manual for several years).

### III.    Count VII

Count VII alleges that LJM Funds Management and Parvataneni made false and misleading statements about LJM Funds Management's use of historical scenarios stress reports to manage

LJM's portfolios in the 15(c) responses provided to the Two Roads Shared Trust Board in 2016 and 2017. The Two Roads Shared Trust is an open-end management investment company that consisted of multiple mutual funds, including the LJM Preservation and Growth Fund. Defendants do not dispute that they had a duty to furnish this information accurately, only that they failed to meet it. 15 U.S.C. § 80a-15(c); Doc. [100] at 52. LJM moves for summary judgment on the basis that the statements made to Two Roads Board were not false. LJM posits that it never told Two Roads that it was using the Stress Scenario Report - Historical Scenarios Report to evaluate historical data, so the fact that it did not use that report did not make the statement false.

The parties' arguments on Count VII in large part reference back to their arguments on whether the statements LJM made about its historical stress testing were false because LJM did not rely on the Stress Scenario Report - Historical Scenarios Report to evaluate historical data. As discussed above, there are disputed facts regarding whether LJM not using the Stress Scenario Report - Historical Scenarios Report rendered their statements regarding testing historical scenarios false. Therefore, the Court denies summary judgment on Count VII.

## IV.    Defendants' Eighth Affirmative Defense

Lastly, the SEC moves for summary judgment on the Defendants' Eighth Affirmative Defense, Acts by Third Parties, which states:

> The SEC's claims against Defendants fail in whole or in part because the occurrences alleged in the Complaint and all losses alleged, including those at Paragraphs 1 and 11 of the Complaint, if any, resulting therefrom were caused by the acts or omissions of third parties over whom Defendants had no control, including, but not limited to, market forces. Defendants conduct was not the proximate cause of any of the investor losses alleged by the SEC.

The SEC argues that it is entitled to summary judgment because this defense fails as a matter of law and Defendants failed to provide any admissible evidence to support it. Defendants

insist that the defense provides an excuse or justification for why the risk profile was inconsistent on February 5-6, 2018, and that they provided evidence to support this.

The problem for Defendants is that they failed to articulate how, even if they provided admissible evidence, this claim would excuse their liability on any of the counts. "An affirmative defense limits or excuses a defendant's liability even if the plaintiff establishes a prima facie case." *Bell v. Taylor*, 827 F.3d 699, 704–05 (7th Cir. 2016) (internal quotation omitted). "In other words, an affirmative defense is a defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's claim, even if all the allegations in the complaint are true." *Id.* at 705 (internal quotation omitted). Traditional affirmative defenses include duress, estoppel, assumption of the risk, fraud, and waiver. Fed. R. Civ. P. 8(c)(1) (identifying affirmative defenses). Here, Defendants argue that, even if the SEC establishes that Defendants intentionally or recklessly made material false statements, the acts of third parties provide an excuse for them to avoid liability.

To establish a violation, the SEC must show that the Defendants: "(1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities." *McConville*, 465 F.3d at 786 (7th Cir. 2006). To evaluate an affirmative defense, we assume the SEC can establish these elements. The fatal flaw in Defendants argument is that even if an unknown third party manipulated the markets on February 5-6, 2018, causing the investor losses on those days, it does not excuse their liability to the SEC under the elements of securities fraud. Put another way, defendants are not forgiven for lying to investors and committing securities fraud simply because other traders committed securities fraud through market manipulation. Moreover, the SEC may obtain civil penalties in antifraud actions even if no investors suffered actual financial losses, so even if Defendants established that third party acts caused the actual losses to investors, it would not excuse their liability to the SEC. *SEC v. Jarkesy*,

144 S. Ct. 2117, 2126 (2024); *Schellenbach v. SEC*, 989 F.2d 907, 913 (7th Cir. 1993).  In addition, Defendants provided no legal precedent to support this as a plausible theory to excuse liability and the Court found none.  As there is no basis on which this defense could excuse liability, establishing market manipulation is not evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, this defense fails as a matter of law.  The SEC is granted summary judgment on Defendants' Eighth Affirmative Defense.[15]

**Conclusion**

For these reasons, Defendants' motion for summary judgment [99] is denied and the SEC's motion for summary judgment [101] is granted in part and denied in part.

**SO ORDERED.**

Dated:  October 3, 2024

_____
Sunil R. Harjani
United States District Judge

---

[15] To the extent Defendants wish to raise the conduct of third parties as it relates to the amount of potential civil monetary penalties that should be awarded if they are found liable, Defendants may raise those arguments later at the appropriate time.